*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 13-BG-1439

IN RE BARRY J. NACE, RESPONDENT.

A Member of the Bar of the District of Columbia
Court of Appeals
(Bar Registration No. 130724)

On Bar Counsel's Statement Regarding Reciprocal Discipline
(BDN-324-13)

(Argued June 3, 2014                               Decided September 4, 2014)

*Christopher T. Nace* for respondent.

*William R. Ross*, Assistant Bar Counsel, with whom *Wallace E. Shipp, Jr.*, Bar Counsel, was on the Statement Regarding Reciprocal Discipline, for the Office of Bar Counsel.

Before THOMPSON and MCLEESE, *Associate Judges*, and REID, *Senior Judge*.

PER CURIAM: Respondent Barry Nace has been a member of the Bar of this court since 1972. Mr. Nace is also admitted to practice in Maryland, Pennsylvania, and West Virginia. In March 2013, the Supreme Court of Appeals of West Virginia found that Mr. Nace had committed numerous disciplinary violations and suspended Mr. Nace for 120 days. *Lawyer Disciplinary Bd. v. Nace*, 753 S.E.2d 618, 621-22 (W. Va.) (per curiam), *cert. denied*, 134 S. Ct. 474 (2013). The

District of Columbia Office of Bar Counsel recommends that this court impose reciprocal discipline upon Mr. Nace. We adopt that recommendation.

**I.**

Except as noted, the following facts are undisputed. In February 2004, Barbara Miller retained a West Virginia attorney named D. Michael Burke to represent her, in her capacity as administrator of her husband's estate, in a potential medical-malpractice claim to be filed in West Virginia. Mr. Burke asked Mr. Nace to review the case and determine whether to pursue the claim. Mr. Burke and Mr. Nace had worked together on numerous medical-malpractice cases over the preceding twenty years.

In September 2004, Ms. Miller filed a petition for bankruptcy in West Virginia. Ms. Miller retained separate legal counsel to handle the bankruptcy matter. The bankruptcy court appointed Robert Trumble as the interim trustee of the bankruptcy estate. The petition was filed as a "no asset" case and listed the malpractice action, describing the value of the action as unknown and claiming that the action was exempt. Mr. Trumble subsequently wrote to Mr. Burke, attempting to determine the value of the malpractice action. Mr. Burke replied that the action

was being evaluated by Mr. Nace and that a valuation of the case could not be completed until after a medical review. Mr. Trumble subsequently sent separate letters to Mr. Burke and Mr. Nace containing the following: (1) an application to employ Mr. Burke and Mr. Nace as special counsel for the trustee, for the purpose of pursuing litigation on behalf of Ms. Miller; (2) a proposed order authorizing Mr. Trumble to employ special counsel; and (3) an affidavit indicating willingness to accept employment as special counsel.[1] The letter asked Mr. Burke and Mr. Nace to review the enclosed documents and said that, upon receipt of the signed affidavit, Mr. Trumble would submit the documents to the bankruptcy court for approval.

In February 2005, Mr. Nace signed and returned the affidavit, stating that he was "willing to accept employment by [Mr. Trumble] on the basis set forth in the Application to Employ [Special Counsel] . . . ." After receiving affidavits from both Mr. Burke and Mr. Nace, Mr. Trumble filed the application, which the bankruptcy court approved by entering an order in March 2005. Mr. Nace claims

---

[1] Under the Bankruptcy Code, a trustee may request approval from the bankruptcy court to employ special counsel. 11 U.S.C. § 327 (a) (2012). The role of special counsel is "to represent or assist the trustee in carrying out the trustee's [bankruptcy] duties . . . ." *Id.*

that the order was sent to an incorrect address and that he did not receive notice of the order.

In June 2005, Ms. Miller filed a medical-malpractice complaint in the West Virginia state courts. Soon thereafter, Mr. Burke notified Ms. Miller that he had to withdraw as counsel from the medical-malpractice case due to a conflict of interest, but that Mr. Nace would continue to represent Ms. Miller. In September 2006, Ms. Miller reached a partial settlement for $75,000 with one of the medical-malpractice defendants. Later that month, Mr. Nace wrote to Ms. Miller: "[P]resumably you have a bankruptcy attorney and if so that person should call me so I know whether or not a check can be written to you." Without informing Mr. Trumble or the bankruptcy court, Mr. Nace subsequently distributed the proceeds of the settlement to Ms. Miller. In October 2006, Ms. Miller -- represented by Mr. Nace -- proceeded to trial against the remaining defendants, obtaining a judgment for $500,000.

In July 2007, Mr. Trumble sent a letter to Mr. Burke asking about the status of the medical-malpractice case. Although Mr. Burke's records indicate that the letter was forwarded to Mr. Nace's address, Mr. Nace claims that he did not receive a copy of the letter. In March 2008, again without informing Mr. Trumble

or the bankruptcy court, Mr. Nace sent Ms. Miller a check for over $200,000, to reflect her share of the proceeds from the medical-malpractice judgment.

In October 2008, Mr. Trumble sent letters to Mr. Burke and Mr. Nace saying that he had discovered that the medical-malpractice case had been resolved but had received neither notice of that resolution nor the bankruptcy estate's portion of the proceeds from the case. Mr. Trumble did not send the letter to Mr. Nace's correct address. In November 2008, Mr. Trumble sent a second letter to Mr. Nace at the correct address, requesting settlement documents mentioned in the October 2008 letter. In his response, Mr. Nace said that he had not received the October 2008 letter, "that there was not any settlement . . . [because] the case was tried to jury verdict," and that he was unsure why Mr. Trumble expected that Mr. Nace would contact him, because "there was no settlement." Mr. Nace indicated in a subsequent letter that he had not heard from Mr. Trumble since signing the affidavit in February 2005 and had not received the application to employ special counsel or the order authorizing appointment of special counsel until January 2009.

Mr. Trumble filed a disciplinary complaint against Mr. Nace in West Virginia, based on Mr. Nace's failure to distribute proceeds from the medical-

malpractice judgment to the bankruptcy estate.[2]   After receiving notice of the complaint from the Office of Disciplinary Counsel ("ODC"), Mr. Nace responded by letter, saying that he had not received a copy of the application to employ special counsel in January 2005 when he received the affidavit and that he "*subsequently learned [the application] existed*."

The ODC issued a subpoena ordering Mr. Nace to appear at a hearing before an Investigative Panel of the Lawyer's Disciplinary Board ("LDB") and to produce his "complete client file relating to [his] representation of [Mr.] Trumble."  At the hearing, Mr. Nace testified that he had not seen the application to employ special counsel or the affidavit sent by Mr. Trumble until late 2009, and that -- other than the affidavit he had signed -- he did not know about the bankruptcy proceeding involving Ms. Miller when he distributed the settlement proceeds to Ms. Miller. Pursuant to the subpoena, Mr. Nace turned over ninety pages of documents from four boxes of client files.  Mr. Nace did not turn over his September 2006 letter asking Ms. Miller who her bankruptcy attorney was.

---

[2]   According to Mr. Nace, the bankruptcy estate would at most be entitled to approximately $12,700 of the proceeds from the medical-malpractice judgment.

In October 2010, Mr. Trumble filed a complaint against Mr. Burke and Mr. Nace in the Bankruptcy Court for the Northern District of West Virginia, alleging breach of contract and legal negligence in connection with the failure to turn over medical-malpractice proceeds to the bankruptcy estate.[3]  *In re Miller*, Nos. 04-3365, etc., 2013 WL 3808133, at *1-2 (Bankr. N.D. W. Va. July 21, 2013).

In October 2011, Mr. Nace appeared at a second hearing, before the West Virginia Hearing Panel Subcommittee ("HPS").  Mr. Nace testified that he had signed the affidavit because "Mr. Burke asked [him] to sign," but that he then did not hear from Mr. Trumble until late 2008.  Mr. Nace testified that although he did not recall seeing the application to employ special counsel or the proposed order, he had in fact received those documents.  The HPS questioned Mr. Nace regarding his failure to produce the September 2006 letter to Ms. Miller -- discovered in Mr. Burke's files -- in response to the subpoena.  Mr. Nace testified that he had "many, many, many files" relating to Ms. Miller's medical-malpractice case and that he

---

[3]  In the bankruptcy proceeding, Mr. Nace and Mr. Burke moved to vacate the March 2005 bankruptcy-court order authorizing their employment as special counsel, on the basis that the order was void for lack of subject-matter jurisdiction. *In re Miller*, 2013 WL 3808133, at *2.  They also moved for summary judgment, alleging that the bankruptcy estate lacked any interest in the medical-malpractice claim, because Mr. Trumble had failed to properly object to Ms. Miller's claimed exemptions. *Id.* at *4.  The bankruptcy court denied both motions. *Id.* at *1.  The matter appears to remain pending against Mr. Nace.

had only produced documents that he thought might be appropriate. In an affidavit executed two days after the HPS hearing, Mr. Nace explained that he did not have a complete client file for Mr. Trumble, because he had never represented Mr. Trumble. Mr. Nace added that the ODC had not requested his entire file on the medical-malpractice case and that the questions and subpoena requests from the LDB "were clearly inartful."

The HPS found by clear and convincing evidence that Mr. Nace had violated West Virginia Rules of Professional Conduct 1.1 (competence), 1.3 (diligence), 1.4 (a) and (b) (communication with client), 1.15 (b) (safekeeping property), 8.4 (c) (dishonesty), and 8.4 (d) (conduct prejudicial to administration of justice). The HPS recommended that Mr. Nace be suspended from practicing law in West Virginia for 120 days without any requirement for reinstatement, that Mr. Nace provide fifty hours of pro bono representation, and that Mr. Nace comply with the disposition of the pending bankruptcy action against him.

Mr. Nace challenged the proposed discipline in the Supreme Court of Appeals of West Virginia, arguing among other things that Mr. Trumble was not his client and that the West Virginia courts lacked jurisdiction over the disciplinary

case, because Mr. Nace's responsibilities to Mr. Trumble were controlled by the bankruptcy court.

The West Virginia Supreme Court disagreed with Mr. Nace's arguments, found that Mr. Nace had committed disciplinary infractions, and adopted the sanction recommended by the HPS. The West Virginia Supreme Court determined that it had jurisdiction, because the West Virginia Rules of Professional Conduct governed Mr. Nace's duties to Mr. Trumble, and the question whether Mr. Nace had violated those Rules was subject to review by the West Virginia Supreme Court. On the merits, the West Virginia Supreme Court found that Mr. Nace and Mr. Trumble had formed an attorney-client relationship and that Mr. Nace therefore did have a duty to Mr. Trumble. The West Virginia Supreme Court stated that "any reasonable attorney, especially one with more than 40 years of experience, would have expected that an attorney-client relationship had formed."

The West Virginia Supreme Court further found that undisputed facts supported the HPS's findings that Mr. Nace had violated the West Virginia Rules of Professional Conduct. Specifically, the West Virginia Supreme Court found that Mr. Nace did not make any attempt to communicate with Mr. Trumble between early 2005 and late 2008. The West Virginia Supreme Court found that

Mr. Nace was "dishonest" and "knowingly untruthful" in his statements to Mr. Trumble regarding the proceeds from the settlement. The West Virginia Supreme Court also found that Mr. Nace had "intentionally obfuscated" the LDB investigation, "deliberately avoid[ed] producing" documents that he knew the LDB was seeking, and falsely represented for over twenty-four months that he did not have a copy of the application to employ special counsel and the proposed order.

With respect to the severity of the proposed sanction, the West Virginia Supreme Court recognized that Mr. Nace had no history of disciplinary violations and was esteemed among his peers. The West Virginia Supreme Court determined that those mitigating factors were outweighed by aggravating factors -- namely, Mr. Nace's refusal to accept responsibility for his failure to properly represent Mr. Trumble, Mr. Nace's dishonesty, and Mr. Nace's obfuscation of the disciplinary investigation. The West Virginia Supreme Court therefore suspended Mr. Nace from practicing law in West Virginia for 120 days.

## II.

In January 2014, this court issued an order temporarily suspending Mr. Nace from practicing law in the District of Columbia and directing Mr. Nace to show

cause why identical reciprocal discipline should not be imposed. *See* D.C. Bar R. XI, § 11 (d). Under Rule XI, § 14 (g), an attorney who is subject to discipline in another jurisdiction may file an affidavit in support of a request to have discipline in this jurisdiction run concurrently with the discipline in the original jurisdiction. The affidavit must be filed within ten days of an interim order of suspension. *Id*. This court's order temporarily suspending Mr. Nace issued on January 17, 2014. Mr. Nace submitted the affidavit required by Rule XI on February 6, 2014. On March 28, 2014, this court issued an order concluding that the affidavit was untimely and that Mr. Nace was thus suspended from the practice of law in the District of Columbia for a period of 120 days starting from February 6, 2014. Although Mr. Nace and Bar Counsel dispute whether the affidavit was timely filed, Mr. Nace's 120-day suspension in this jurisdiction ended in June 2014. The question whether Mr. Nace's suspension should have been concurrent in this jurisdiction is therefore moot.

We conclude otherwise with respect to Mr. Nace's claim that he should not have been subject to reciprocal discipline at all. *See, e.g.*, *In re Surrick*, 338 F.3d 224, 229-30 (3d Cir. 2003) (attorney's challenge to suspension in reciprocal-discipline proceeding was not moot, even though suspension expired before court's consideration of matter, due to "continuing stigma resulting from [attorney's]

suspension"). Similarly, disciplinary authorities generally consider a lawyer's prior disciplinary history, including the severity of the sanction imposed, in determining future disciplinary sanctions, and thus the question whether the 120-day suspension was an appropriate sanction could also have collateral consequences. *See Attorney Grievance Comm'n v. Post*, 839 A.2d 718, 724-25 (Md. 2003) (in determining appropriate sanction, court considers "the attorney's prior grievance history – whether there were prior disciplinary proceedings, the nature of the misconduct involved in those proceedings and the nature of any sanctions imposed"). We therefore address Mr. Nace's challenges to the imposition of reciprocal discipline and to the length of his suspension.

## III.

Mr. Nace opposes reciprocal discipline, arguing among other things that the West Virginia Supreme Court should have held the disciplinary proceeding in abeyance pending resolution of the bankruptcy litigation; that one of the members of the Investigative Panel of the West Virginia LDB worked at the same law firm as the bankruptcy trustee; that Mr. Nace was never in an attorney-client relationship with the bankruptcy trustee; and that the West Virginia Supreme Court erred in concluding that Mr. Nace acted dishonestly or otherwise committed

disciplinary infractions.  Bar Counsel argues that Mr. Nace has not shown good cause why identical reciprocal discipline should not be imposed.  We agree with Bar Counsel.

**A.**

This court has "adopted a rigid standard for reciprocal bar discipline cases." *In re Zdravkovich*, 831 A.2d 964, 968 (D.C. 2003).  "[W]e presumptively impose identical reciprocal discipline, unless the attorney demonstrates by clear and convincing evidence that the case falls within one of five specified exceptions articulated in [D.C. Bar] Rule XI, § 11 (c)."  *Id.*  The exceptions are:  (1) the procedure elsewhere violated due process; (2) there was a clear infirmity of proof; (3) the imposition of identical reciprocal discipline would result in a grave injustice; (4) the misconduct elsewhere warrants substantially different discipline in the District of Columbia; or (5) the misconduct elsewhere does not qualify as misconduct in the District of Columbia.  Rule XI, § 11 (c).  The exceptions "should be rare."  *In re Chang*, 83 A.3d 763, 766 (D.C. 2014) (per curiam) (internal quotation marks omitted).  This rigid standard reflects "the notion that another jurisdiction has already afforded the attorney a full disciplinary proceeding" and "the idea that there is merit in according deference . . . to the actions of another

jurisdiction with respect to the attorneys over whom we share supervisory authority." *In re Fuchs*, 905 A.2d 160, 164 (D.C. 2006) (per curiam). Furthermore, in reciprocal discipline cases we generally accept the ruling of the original jurisdiction, pursuant to principles of collateral estoppel. *In re Wilde*, 68 A.3d 749, 761 n.18 (D.C. 2013). "Reciprocal discipline proceedings are not a forum to reargue the foreign discipline." *In re Chang*, 83 A.3d at 766 (internal quotation marks and brackets omitted). We see no adequate basis in this case to look behind the discipline imposed by the West Virginia Supreme Court.

### B.

Mr. Nace contends that reciprocal discipline is inappropriate because the West Virginia court "erred dramatically in [its] interpretation of the facts[.]" He alleges among other things that his reliance on Mr. Burke in signing the affidavit was an "honest error"; that the affidavit indicated only a "willingness" to be employed as special counsel rather than an acceptance of employment; that he did not thereafter receive notice that the order of appointment had been issued; that he never received the January 2007 letter from the bankruptcy trustee; that he "simply erred" in saying that "there was no settlement"; that he never "*intentionally* failed" to give funds to Mr. Trumble; that any failure to provide documents to the West

Virginia disciplinary authorities was inadvertent; and that he promptly placed the disputed amount into the court's registry.

Mr. Nace makes a number of points that could appropriately be considered by a fact-finder in the first instance, but our role in this reciprocal discipline matter is narrowly circumscribed. We would be permitted to look behind the factual findings of the West Virginia disciplinary authorities only if "[t]here was such infirmity of proof . . . as to give rise to the clear conviction that the [c]ourt could not, consistently with its duty, accept as final the conclusion on that subject . . . ." D.C. Bar Rule XI, § 11 (c)(2); *see also In re Sheridan*, 798 A.2d 516, 518 (D.C. 2002) ("We defer to findings of fact made by other courts in reciprocal proceedings."). Under that highly deferential standard of review, we are not free to disturb the West Virginia Supreme Court's findings. Although a reasonable fact-finder might have resolved some of the disputed factual issues in Mr. Nace's favor, the evidence permitted the West Virginia authorities to resolve those issues adversely to Mr. Nace, including the findings that Mr. Nace's inaccurate statements and failures to produce pertinent information reflected dishonesty and an intent to obfuscate the West Virginia disciplinary proceedings. *Cf. Potomac Elec. Power Co. v. District of Columbia Dep't of Emp't Servs.*, 77 A.3d 351, 354 (D.C. 2013) ("[W]here there is substantial evidence to support the [agency's]

findings . . . the mere existence of substantial evidence contrary to that finding does not allow this court to substitute its judgment for that of the [agency].") (internal quotation marks omitted).

## C.

Mr. Nace contends that he committed no disciplinary infractions in connection with his failure to distribute proceeds from the medical-malpractice judgment to the bankruptcy estate, because he never formed an attorney-client relationship with Mr. Trumble. More specifically, Mr. Nace first contends that because he never received notice that the bankruptcy court had entered the order authorizing his employment as special counsel for the bankruptcy estate, no attorney-client relationship formed.

The West Virginia Supreme Court concluded that, as a matter of its law, an attorney-client relationship was formed even if Mr. Nace was truthful in his claim that he did not receive notice that the bankruptcy court had authorized Mr. Nace to serve as special counsel. The West Virginia Supreme Court stated that an attorney-client relationship arises once "a client has expressed a desire to employ an attorney and there has been a corresponding consent on the part of the attorney

. . . ." Those requirements were met in this case, the West Virginia Supreme Court concluded, because Mr. Trumble asked Mr. Nace to serve as special counsel and Mr. Nace agreed. Finally, the West Virginia Supreme Court explained, the formation of an attorney-client relationship was "conditioned on entry of the order [appointing Mr. Nace as special counsel], not entry of the order *and* delivery of notice to Mr. Nace." *Id.* at 629.

Although we do not have local law squarely on point, we agree with the reasoning of the West Virginia Supreme Court. Mr. Nace consented to serve as special counsel and Mr. Trumble indicated that he planned to ask the bankruptcy court to appoint Mr. Nace.[4] We can assume, as the West Virginia Supreme Court did, that Mr. Nace's consent was conditioned on approval of the request that he be appointed. But Mr. Nace's consent was not conditioned on receipt of a notice that the request had been granted, and widely accepted principles of law suggest that, under the circumstances, the attorney-client relationship formed at the time of appointment, even if Mr. Nace did not receive notice of his appointment. For

---

[4] The application for appointment of special counsel incorrectly referred to a personal-injury claim resulting from a vehicular accident, rather than a medical-malpractice claim, but we see no reason why that that error would affect the question whether an attorney-client relationship had formed.

example, the *Restatement (Third) of the Law Governing Lawyers* § 14 (2000) provides that:

> A relationship of client and lawyer arises when: (1) a person manifests to a lawyer the person's intent that the lawyer provide legal services for the person; and either (a) the lawyer manifests to the person consent to do so; or (b) the lawyer fails to manifest lack of consent to do so, and the lawyer knows or reasonably should know that the person reasonably relies on the lawyer to provide the services . . . .

*Accord, e.g.*, *DG Cogen Partners, LLC v. Lane Powell PC*, 917 F. Supp. 2d 1123, 1137 (D. Or. 2013) (under Oregon law, attorney-client relationship arises where "the lawyer understood or should have understood that the relationship existed") (internal quotation marks omitted); *Attorney Grievance Comm'n v. Kreamer*, 946 A.2d 500, 521 (Md. 2008) (attorney-client "relationship may arise by implication from a client's reasonable expectation of legal representation and the attorney's failure to dispel those expectations") (internal quotation marks omitted); *cf. George v. Caton*, 600 P.2d 822, 824-28 (N.M. Ct. App. 1979) (attorneys' statements to purported clients that they would "handle" case created genuine issue of material fact as to whether attorney-client relationship existed, even though purported clients had contacted attorneys only once six months after first visit and not thereafter for two-and-a-half years, and there was no written agreement).

We give substantial weight to the approach taken by the Restatement.

> [T]he Restatement . . . is written by the American Law Institute (ALI), an organization compris[ing] . . . especially distinguished judges, attorneys, and scholars. The Restatement may be regarded both as the product of expert opinion and as the expression of the law by the legal profession. Although we are not required to follow the Restatement, we should generally do so where we are not bound by the previous decisions of this court or by legislative enactment, . . . for by so doing uniformity of decision will be more nearly effected.

*District of Columbia v. Tulin*, 994 A.2d 788, 797 n.10 (D.C. 2010) (citations, internal quotation marks, and brackets omitted). Applying the Restatement's approach in the present case, we conclude that an attorney-client relationship arose by the time of the order granting Mr. Nace's appointment, because Mr. Trumble had asked Mr. Nace to provide legal services, Mr. Nace had consented to provide legal services, and Mr. Nace knew or should have known that Mr. Trumble would be relying on him to provide those services. Moreover, Mr. Trumble in fact did rely on Mr. Nace to serve as counsel, as is reflected by the letters Mr. Trumble subsequently sent. Under our law, the understanding of the client is an "important

consideration in determining whether [an] attorney-client relationship existed[.]" *In re Bernstein*, 707 A.2d 371, 375 (D.C. 1998) (internal quotation marks omitted).

In sum, we agree with the West Virginia Supreme Court that it was unreasonable for Mr. Nace to act as though the plan to appoint him had failed, because proceeding in that fashion created a risk that he was failing to fulfill his professional responsibilities to a client. It was even more unreasonable for Mr. Nace, without taking any steps to inform the bankruptcy court or his client and without checking to see whether he had been appointed special counsel, to distribute proceeds from the medical-malpractice judgment that potentially were part of the bankruptcy estate.

Second, Mr. Nace argues that Mr. Trumble was not his client but rather was his supervisory attorney. It is not clear whether Mr. Nace is correct on this point. The statute authorizing the appointment of special counsel indicates that counsel can be appointed either to "represent" the trustee or to "assist" the trustee. 11 U.S.C. § 327 (a). The application to employ special counsel refers to Mr. Nace as "Trustee's legal counsel" and as "special counsel for the Trustee . . . ." Courts appear to have reached various conclusions as to whom a bankruptcy special counsel represents. *Compare In re Cont'l Coin Corp.*, Nos. CV 08-0093, etc.,

2009 WL 2589635, at *8 (C.D. Cal. Aug. 21, 2009) (bankruptcy trustee's attorney has attorney-client relationship only with trustee), *with In re Prairie Cent. Ry.*, 209 B.R. 232, 235 (Bankr. N.D. Ill. 1997) ("When an attorney is retained a[t] the trustee's request, the attorney's client is actually the estate, not the trustee."). In any event, a conclusion that Mr. Trumble was Mr. Nace's supervisor and that the bankruptcy estate was Mr. Nace's client would not materially advance Mr. Nace's case. Simply changing the identity of Mr. Nace's client would not undermine the West Virginia Supreme Court's conclusions that Mr. Nace failed to fulfill his professional responsibilities, by failing to act with competence and diligence with respect to the bankruptcy estate, by failing to safeguard property in which the bankruptcy estate had an interest, and by acting dishonestly in his dealings with Mr. Trumble and the West Virginia disciplinary authorities.

It may be true, as Mr. Nace contends, that Mr. Trumble failed to carry out his responsibilities as a supervising attorney, both under federal law and under West Virginia's Rules of Professional Conduct. But any failings by Mr. Trumble would not constitute a defense to the findings in this case that Mr. Nace committed disciplinary infractions under either West Virginia's rules or the rules of this court. W. Va. R. Prof. Conduct 5.2 (subordinate lawyer is bound by Rules of Professional Conduct, but does not violate Rules if subordinate lawyer relies on supervisory

lawyer's reasonable resolution of arguable question of professional duty); D.C. R. Prof. Conduct 5.2 (same).

**D.**

Mr. Nace argues that it was premature for the West Virginia Supreme Court to decide the disciplinary matter while relevant litigation was pending in federal bankruptcy court. Mr. Nace further asserts that the bankruptcy litigation might resolve issues -- such as whether the bankruptcy court had jurisdiction over the proceeds of the medical-malpractice judgment and whether Mr. Trumble was negligent in performing his duties as trustee -- in a way that would absolve Mr. Nace of committing any disciplinary infractions. We do not agree that the West Virginia Supreme Court was required to await resolution of the bankruptcy litigation.

The question whether Mr. Nace committed the disciplinary infractions -- by failing to act competently and diligently, by failing to safeguard property in which his client had an interest, and by acting dishonestly -- turns almost entirely on questions of West Virginia law (and for current purposes, also on the law of this jurisdiction), rather than on questions of federal bankruptcy law. In theory, a

conclusion that the bankruptcy estate lacked even an arguable claim to any proceeds of the medical-malpractice action might draw into question the determination of the West Virginia Supreme Court that Mr. Nace failed to safeguard property in which the bankruptcy estate had an interest. D.C. R. Prof. Conduct 1.15 (b); *cf. In re Edwards*, 808 A.2d 476, 483 (D.C. 2002) (substantial evidence did not support finding that attorney misappropriated client funds by drawing check from escrow account, where "there [was] no evidence that [client] . . . had any interest in the money remaining in the escrow account at the time that [attorney] drew the check"). Such a conclusion seems unlikely, however, given the ruling of the bankruptcy judge denying Mr. Nace's motion for summary judgment. *In re Miller*, 2013 WL 3808133, at \*4-6 (bankruptcy trustee's failure to object to debtor's claimed exemption of medical-malpractice action did not divest bankruptcy estate of any interest in action).

More generally, the federal courts have broadly upheld the authority of state courts to impose discipline upon attorneys under state professional-conduct rules based on conduct that occurred in front of federal tribunals. *See, e.g.*, *Gadda v. Ashcroft*, 377 F.3d 934, 943-46 (9th Cir. 2004) (state supreme court had jurisdiction to impose discipline upon attorney for performing incompetently in federal immigration proceedings, where attorney failed to demonstrate that federal

regulation of attorneys in immigration matters preempted state regulation of attorney's conduct); *Kroll v. Finnerty*, 242 F.3d 1359, 1364 (Fed. Cir. 2001) (federal statute authorizing Patent and Trademark Office to regulate practice of patent law before Office did not preempt "the authority of states to punish attorneys who violate ethical duties under state law"); *see generally Sperry v. Florida*, 373 U.S. 379, 402 (1963) ("[T]he State maintains control over the practice of law within its borders except to the limited extent necessary for the accomplishment of the federal objectives."). *Cf. In re Bridges*, 805 A.2d 233, 234-35 (D.C. 2002) (rejecting argument that Maryland Court of Appeals had no jurisdiction over attorney's federal practice; "The court disciplined [attorney] solely because he did not cooperate with a state investigation into whether his legal practice was authorized. Nothing in *Sperry* limits the state's power to either conduct such an investigation or to sanction an attorney for obstructing it."). Although Mr. Nace also argues that the West Virginia Supreme Court ought to have stayed disciplinary proceedings pending resolution of the bankruptcy litigation, he cites no authority in support of that argument. Essentially for the reasons already stated, we conclude that the West Virginia Supreme Court was free to resolve the disciplinary matter without awaiting the resolution of the bankruptcy litigation (which appears to still be pending before the bankruptcy court).

**E.**

Mr. Nace contends that the West Virginia proceedings violated his due-process rights, because the chairperson of the Investigative Panel of the LDB was a partner at the same law firm as Mr. Trumble. The function of the Investigative Panel, which has seven members, is "to determine whether probable cause exists to formally charge a lawyer with a violation of the [West Virginia] Rules of Professional Conduct." W. Va. Lawyer Disciplinary Procedure R. 2 and 2.1. Although we do not know the extent of the Investigative Panel chairperson's involvement in the West Virginia disciplinary proceedings, Mr. Nace argues that he has been trying to obtain that information and that the West Virginia disciplinary authorities have been unwilling to provide it. Assuming for current purposes that the Investigative Panel chairperson did participate, we note that there is no suggestion that the Investigative Panel did anything other than determine whether to file formal charges. Furthermore, after formal charges are filed, a three-member hearing panel subcommittee conducts hearings and recommends sanctions to the West Virginia Supreme Court. W. Va. Lawyer Disciplinary Procedure R. 3 and 3.3. The West Virginia Supreme Court then determines whether an infraction occurred and if so what discipline to impose, "giv[ing] respectful consideration to the Hearing Panel Subcommittee's recommendations while ultimately exercising

its own independent judgment." *Lawyer Disciplinary Bd. v. Kupec*, 505 S.E.2d 619, 626 (W. Va. 1998) (internal quotation marks and brackets omitted). Given the limited function served by the Investigative Panel, and the subsequent independent determinations by the West Virginia disciplinary authorities, we conclude that there was no due-process violation warranting a denial of reciprocal discipline. *Cf., e.g.*, *Standing Comm. on Discipline v. Yagman*, 55 F.3d 1430, 1435-36 (9th Cir. 1995) (participation of standing committee that allegedly included members with conflict of interest did not deny attorney due process in disciplinary proceeding, where committee conducted investigations and issued formal complaints but had no authority to impose sanctions, and attorney did not allege that members of committee were biased or would personally benefit; "So long as the judges hearing the misconduct charges are not biased . . . , there is no legitimate cause for concern over the composition and partiality of the . . . [c]ommittee.").

**F.**

Finally, Mr. Nace argues that a 120-day suspension was unduly harsh and that the court should reduce the sanction pursuant to D.C. Bar Rule XI, § 11 (c)(4) (permitting court to decline to impose reciprocal discipline where misconduct in

original jurisdiction would result in substantially different discipline in District of Columbia). Specifically, Mr. Nace argues that he did not personally profit from the potential misdistribution of funds and that he had no disciplinary record for over forty years. Nevertheless, the West Virginia Supreme Court determined that Mr. Nace committed numerous ethical violations by, among other things, acting dishonestly and failing to competently and diligently protect his client's interests. A 120-day suspension is not substantially different from sanctions that have been imposed for similar misconduct in the District of Columbia. *See, e.g.*, *In re Artis*, 883 A.2d 85, 89-91, 103 (D.C. 2005) (attorney suspended for thirty days for failure to cooperate with disciplinary investigation, where attorney failed to respond to questions and to provide documents subject to subpoena); *In re Mitchell*, 822 A.2d 1106, 1109-10 (D.C. 2003) (per curiam) (upholding ninety-day suspension for failure to notify interested third party of money judgment, making false statements to that party about judgment, and acting dishonestly); *In re Balsamo*, 780 A.2d 255, 261-62 (D.C. 2001) (per curiam) (upholding thirty-day suspension for violations of Rules 1.1 (competence), 8.4 (c) (dishonesty), and 8.4 (d) (conduct interfering with administration of justice); "For conduct involving dishonesty . . . [in violation of] Rule 8.4 (c), the discipline this court has imposed has ranged from censure to disbarment.") (citing cases). We therefore adopt Bar Counsel's

recommendation of reciprocal discipline, including a 120-day suspension from the practice of law in the District of Columbia.

*So ordered.*