*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 14-BG-0884

IN RE JOHN T. SZYMKOWICZ,
JOHN P. SZYMKOWICZ,
LESLIE SILVERMAN,
ROBERT KING, RESPONDENTS.

Members of the Bar of the District of Columbia
Court of Appeals
(Bar Registration Nos. 946079, 462146, 448188, and 922575)

On Report and Recommendation of the Board on
Professional Responsibility
(BDN-048-09, BDN-049-09, BDN-050-09, BDN-051-09)

(Argued June 3, 2015                    Decided September 17, 2015)

*Robert N. Levin* for respondents John T. Szymkowicz and John P. Szymkowicz.

*Melvin G. Bergman* for respondents Leslie Silverman and Robert King.

*Julia L. Porter*, Senior Assistant Bar Counsel, with whom *Wallace E. Shipp, Jr.*, Bar Counsel, and *Jennifer P. Lyman*, Senior Assistant Bar Counsel, were on the brief for Bar Counsel.

Before THOMPSON and MCLEESE, *Associate Judges*, and STEADMAN, *Senior Judge*.

PER CURIAM: The Board on Professional Responsibility concluded that

respondent John T. Szymkowicz, his son respondent John P. Szymkowicz, and

respondent Leslie Silverman did not violate any Rules of Professional Conduct in connection with their representation of Genevieve Ackerman. The Board further found that respondent Robert King violated only Rule of Professional Conduct 1.5 (b), by failing to provide Ms. Ackerman with a written retainer agreement. The Board recommends that Mr. King be informally admonished. Mr. King does not contest that finding and recommendation. Bar Counsel challenges the Board's determinations that respondents did not violate Rule 1.7, which relates to conflict of interest, and Rule 8.4, which relates to dishonesty. We accept the Board's determinations with respect to Rule 8.4, but remand for further proceedings with respect to conflict-of-interest issues arising from respondents' representation of Ms. Ackerman.

**I.**

Except where noted, the following facts are undisputed. In May 2002, Ms. Ackerman, who was then eighty-five years old, executed a trust. The trust was intended to support Ms. Ackerman during her lifetime but also to provide support for her son, Dr. Stephen Ackerman. Trust assets included Ms. Ackerman's home on Plymouth Street, NW in Washington, D.C., an interest in a house on North Carolina Avenue, SE in Washington, D.C., and a condominium in Sea Colony,

Delaware. Dr. Ackerman lived in the North Carolina Avenue house. Upon Ms. Ackerman's death, trust assets were to be divided equally between Dr. Ackerman and his sister, Mary Frances Abbott. The trust made monthly payments to Dr. Ackerman, which were to be treated as advances of Dr. Ackerman's share of the trust assets. Frank Abbott, Ms. Abbott's husband, was named trustee, and Ms. Abbott was named successor trustee. Revocation of the trust required approval of the trustee. The trust also contained a no-contest provision, providing that anyone who challenged the trust would lose beneficiary status under the trust.

In the summer of 2002, Dr. Ackerman retained the Szymkowiczes to challenge the trust. Dr. Ackerman contended that Ms. Ackerman wanted him to have the Sea Colony property, which therefore should be excluded from the trust assets. The Szymkowiczes subsequently filed suit ("*Ackerman I*") in Superior Court on behalf of Dr. Ackerman to remove Mr. Abbott as the trustee and to reform the trust by excluding the Sea Colony property from the trust assets. In connection with that lawsuit, Mr. J.T. Szymkowicz met with Ms. Ackerman and obtained an affidavit stating that Ms. Ackerman had intended to leave the Sea Colony property to Dr. Ackerman rather than placing the property into the trust, that she wanted to name Dr. Ackerman as a co-trustee, and that she wanted to

eliminate the no-contest clause because she had not intended to include such a clause in the trust.

A number of health professionals evaluated Ms. Ackerman's condition in 2004. In January 2004, Dr. Lila McConnell, Ms. Ackerman's doctor, concluded that Ms. Ackerman had significant cognitive impairment and would likely be unable to participate in intense questioning. In June 2004, Dr. William Polk found that Ms. Ackerman suffered from mild dementia and depression but that her thoughts were "logical and organized" and that she had the "capacity to make health care and personal decisions for herself." Finally, Dr. Paulo Negro reported in August 2004 that Ms. Ackerman suffered from dementia and cognitive impairment and was "unable to exercise proper judgment."

In August 2004, Dr. Ackerman obtained a power of attorney (POA) from Ms. Ackerman. Ms. Ackerman had previously granted a POA to Ms. Abbott in 1999. Ms. Ackerman revoked Dr. Ackerman's POA in November 2004. Ms. Ackerman subsequently executed several additional documents granting a POA to Dr. Ackerman.

Ms. Ackerman's greatest desire was to restore peace to her family. In December 2004, Mr. J.T. Szymkowicz told Ms. Ackerman that Dr. Ackerman would drop his lawsuit in *Ackerman I* if she would revoke the trust entirely and transfer the trust assets back to herself. In May 2005, the Szymkowiczes began to also represent Ms. Ackerman. The same month, the Szymkowiczes filed a suit in Superior Court, on behalf of Ms. Ackerman, seeking to revoke the trust ("*Ackerman II*"). Dr. Ackerman did not drop *Ackerman I* after the filing of *Ackerman II*.

After holding a trial in May 2005, the trial court in *Ackerman I* ruled in favor of the Abbotts and the trust, finding that there was no basis to reform the trust and that the no-contest provision was valid and enforceable. *Ackerman v. Genevieve Ackerman Family Tr.*, 908 A.2d 1200, 1202 (D.C. 2006). This court affirmed the trial court's judgment. *Id.* at 1201-04.

Ms. Ackerman was also evaluated by doctors in 2006. Dr. Negro concluded in March 2006 that Ms. Ackerman's ability to process complex information was limited, that Ms. Ackerman did not know which papers she had signed with respect to Dr. Ackerman's POA, and that Ms. Ackerman suffered from dementia. Dr. Richard Ratner agreed, based on observations in February and May 2006, that Ms.

Ackerman showed some signs of dementia and that her memory was "problematic." Dr. Ratner concluded, however, that Ms. Ackerman was steady in her desire to grant a POA to Dr. Ackerman and in her belief that the Abbotts had not appropriately consulted Ms. Ackerman about her finances. Ultimately, Dr. Ratner concluded that Ms. Ackerman was competent to revoke the trust and grant a POA to Dr. Ackerman.

In March 2007, Mr. J.T. Szymkowicz withdrew from *Ackerman II* based on a concern that he might be called as a witness by the defense. It is unclear whether Mr. J.T. Szymkowicz withdrew from representing Ms. Ackerman altogether. At Mr. J.T. Szymkowicz's recommendation, Ms. Ackerman hired Ms. Silverman to represent Ms. Ackerman in *Ackerman II*. Toward the beginning of the representation, Ms. Silverman consulted Ms. Ackerman about the litigation for about an hour and a half. Mr. J.T. Szymkowicz and Dr. Ackerman were present at that meeting. Dr. Ackerman paid for Ms. Silverman's services from Ms. Ackerman's funds. In making decisions with regard to the representation, Ms. Silverman consulted with Dr. Ackerman, who held a POA for Ms. Ackerman. Ms. Silverman enlisted Mr. King to help represent Ms. Ackerman in *Ackerman II*.

After a trial in July 2007, the trial court in *Ackerman II* upheld the trust, concluding that Mr. Abbott, as trustee, had not approved revocation of the trust and that there was no basis for removing Mr. Abbott as trustee or ordering an accounting. At the trial, Ms. Ackerman could not remember that a trust had been executed, who had prepared the trust, that Dr. Ackerman had filed suit in *Ackerman I*, or that Mr. Abbott was the trustee. The trial court did not decide the disputed question whether Ms. Ackerman had capacity to file the lawsuit.

At various times during 2007, Dr. Ackerman, Mr. J.T. Szymkowicz, and Ms. Silverman worked to prevent Mr. Abbott from selling Ms. Ackerman's interest in the North Carolina Avenue property, where Dr. Ackerman was living. In addition, Mr. J.T. Szymkowicz drafted (1) a document assigning Ms. Ackerman's interest in the North Carolina Avenue property, as well as other interests, to Dr. Ackerman for $1; and (2) a new will pursuant to which Ms. Ackerman made Dr. Ackerman the personal representative of her estate and removed the trust as beneficiary. Mr. J.T. Szymkowicz sent those documents to Ms. Silverman as "draft models from which to work." Ms. Ackerman subsequently executed those documents.

In September 2007, Mr. Abbott filed suit in Superior Court seeking a declaration that Ms. Ackerman's interest in the North Carolina Avenue property

was part of the trust property. The trial court granted the requested relief. Ms. Silverman noted an appeal on behalf of Ms. Ackerman, but that appeal was later dismissed because Ms. Silverman took no further action in the matter. Dr. Ackerman, represented by the Szymkowiczes, also appealed, and this court affirmed the trial court's ruling. *Ackerman v. Abbott*, 978 A.2d 1250 (D.C. 2009).

In November 2007, Dr. Ackerman filed a pro se petition with the probate court alleging that Ms. Ackerman was incapacitated, because she was legally blind, and seeking to be named Ms. Ackerman's guardian and conservator. Dr. Ackerman later withdrew that petition. Meanwhile, Ms. Abbott filed a petition in March 2008 seeking to be named Ms. Ackerman's guardian and conservator. Although the probate court appointed an attorney to represent Ms. Ackerman in the matter, Dr. Ackerman also retained Mr. King to act as Ms. Ackerman's attorney in the matter. In June 2008, the probate court ruled that Ms. Ackerman had not been competent after 2004. The probate court further found that the POAs granted to Dr. Ackerman were invalid. The probate court nevertheless declined to appoint Ms. Abbott guardian or conservator, because the 1999 POA, which the court found to be valid, gave Ms. Abbott sufficient authority to manage Ms. Ackerman's affairs.

## II.

After Ms. Abbott complained to Bar Counsel about respondents' actions, Bar Counsel brought charges against respondents alleging, in presently pertinent part, violations of Rules 1.5 (b) (failure to provide engagement letter) (King), 1.6 (a)(1) (revealing client confidences or secrets) (King and Silverman), 1.7 (b)(2) (conflicting client interests) (Szymkowcizes), 1.7 (b)(4) (personal-interest conflict) (King and Silverman), 1.16 (a) (failure to withdraw) (all four respondents), 8.4 (c) (dishonesty, fraud, deceit, and misrepresentation) (all four respondents), and 8.4 (d) (serious interference with administration of justice) (all four respondents).

## A.

Between October 2009 and March 2010, a twelve-day hearing was held before the Hearing Committee. At that hearing, Bar Counsel introduced evidence, including testimony from Ms. Abbott, in support of the conclusion that Ms. Ackerman was incompetent at all relevant times and that respondents knew or should have known that to be true. Bar Counsel also introduced evidence supporting a conclusion that Dr. Ackerman's interests and Ms. Ackerman's interests conflicted or at least potentially conflicted. Conversely, respondents

introduced evidence to support the conclusion that, after appropriate inquiry, they reasonably determined that Ms. Ackerman had the legal capacity to make the decisions at issue. Respondents also introduced evidence in support of their positions that Ms. Ackerman's interests and Dr. Ackerman's interests were not conflicting and that respondents had adequately explained any potential conflicts to Ms. Ackerman.

With the exception of Mr. King's failure to obtain a written retainer agreement, the Hearing Committee found no Rule violations. The Hearing Committee found that Ms. Ackerman was suffering from periodic memory loss that worsened over the period at issue. Nevertheless, the Hearing Committee concluded that Ms. Ackerman was capable of consulting with a lawyer and understanding the matters at issue in the proceedings. Moreover, the Hearing Committee concluded that the actions taken by respondents were in Ms. Ackerman's interests, as Ms. Ackerman perceived those interests, even though litigation costs reduced the value of the trust assets and some of respondents' actions, if successful, would have shifted assets from the trust to Dr. Ackerman. Specifically, the Hearing Committee concluded that respondents' actions were consistent with Ms. Ackerman's long-term interest in supporting Dr. Ackerman. Finally, the Hearing Committee concluded that in any event Bar Counsel had failed

to show by clear and convincing evidence that respondents knew or should have known that Ms. Ackerman lacked the legal capacity to make the decisions at issue.

In reaching these conclusions, the Hearing Committee expressed doubts about the credibility of Ms. Abbott's testimony, finding that her anger toward respondents motivated her to press disciplinary charges, that she was biased against respondents, and that she had financial and other interests in preserving the trust.

With respect to Ms. Ackerman's mental status, the Hearing Committee concluded that the question was whether Ms. Ackerman had the capacity to make the particular decisions at issue. The Hearing Committee concluded that the medical evidence consistently indicated that, despite her limitations, Ms. Ackerman had the capacity to enter into contracts and to execute documents such as POAs and wills.

After reaching these general conclusions, the Hearing Committee made extensive specific findings with respect to its conclusions that respondents had not violated the Rules of Professional Conduct. Specifically, with respect to the conflict-of-interest charge arising from Mr. J.T. Szymkowicz's representation of

both Ms. Ackerman and Dr. Ackerman, the Hearing Committee concluded that there was a potential for conflict of interest between Dr. Ackerman and Ms. Ackerman, but that Mr. J.T. Szymkowicz reasonably believed that he had obtained, and in fact did obtain, Ms. Ackerman's informed consent to the joint representation. The Hearing Committee also found that Ms. Ackerman's interests were not adversely affected by the joint representation, because both Dr. Ackerman and Ms. Ackerman wanted Dr. Ackerman to be financially supported. Finally, the Hearing Committee concluded that Mr. J.T. Szymkowicz's actions after March 7, 2007, did not raise a concern about joint representation, because Mr. Szymkowicz was no longer representing Ms. Ackerman.

With respect to the conflict-of-interest charge against Mr. J.P. Szymkowicz, the Hearing Committee found that Mr. J.P. Szymkowicz was a subordinate lawyer who reasonably relied on his father's representations that Ms. Ackerman had given informed consent to joint representation.

Finally, with respect to the conflict-of-interest charges against Ms. Silverman and Mr. King, the Hearing Committee concluded that both Ms. Silverman and Mr. King were entitled to rely on the apparently valid POAs Ms. Ackerman had executed in favor of Dr. Ackerman. Thus, no conflict of interest

was created by Dr. Ackerman's payment of Ms. Silverman and Mr. King's fees or by Dr. Ackerman's management of the litigation on behalf of Ms. Ackerman.

**B.**

The Board agreed with the Hearing Committee's determination that Bar Counsel had failed to establish the alleged Rule violations at issue. Treating the issue as one of fact rather than law, the Board found ample support in the record for the Hearing Committee's conclusion that Ms. Ackerman had the legal capacity to make the decisions at issue. In any event, the Board concluded that the record supported the Hearing Committee's conclusion that respondents reasonably believed that Ms. Ackerman had the requisite capacity.

The Board further concluded that Mr. J.T. Szymkowicz had not violated the conflict-of-interest rule, because he had determined that the interests of Dr. Ackerman and Ms. Ackerman coincided. The Board also concluded that Mr. J.P. Szymkowicz justifiably relied on Mr. J.T. Szymkowicz's assurances that any potential conflict of interest had been adequately addressed with Ms. Ackerman. Finally, the Board concluded that Ms. Silverman and Mr. King did not commit conflict-of-interest violations. Specifically, although Ms. Silverman and Mr. King

were paid by Dr. Ackerman and consulted with Dr. Ackerman in their representation of Ms. Ackerman, Ms. Silverman adequately determined that Ms. Ackerman's interests coincided with those of Dr. Ackerman.

Two Board members concurred separately. They concluded that Ms. Ackerman lacked capacity to make the decisions at issue or to give informed consent to the potential conflict between her interests and those of Dr. Ackerman. Nevertheless, they concurred in the Board's conclusion that respondents did not violate the rules at issue, because respondents took reasonable measures to determine Ms. Ackerman's competence and to obtain informed consent.

## III.

"[T]he burden of proving . . . disciplinary charges rests with Bar Counsel, and [the Board's] factual findings must be supported by clear and convincing evidence." *In re Allen*, 27 A.3d 1178, 1184 (D.C. 2011) (internal quotation marks omitted). We "shall accept the findings of fact made by the Board unless they are unsupported by substantial evidence of record . . . ." D.C. Bar R. XI, § 9 (h)(1). Similarly, the Board must defer to the factual findings of the Hearing Committee if those findings are supported by substantial evidence. *See, e.g.*, *In re Brown*, 112

A.3d 913, 917 (D.C. 2015) (per curiam).  We owe no deference to the Board's legal conclusions.  *In re Yelverton*, 105 A.3d 413, 420 (D.C. 2014), *petition for cert. filed*, No. 15-5001 (U.S. June 30, 2015).

**A.**

Bar Counsel challenges the Board's determination that respondents did not violate Rule 8.4 (c) (dishonesty, fraud, deceit, and misrepresentation) and (d) (serious interference with administration of justice).  Specifically, Bar Counsel argues that because respondents "knew Mrs. Ackerman had executed documents she was not competent to understand, their use of the documents was dishonest and interfered with the administration of justice."  We find that there was sufficient evidence for the Board to conclude that Bar Counsel had failed to demonstrate by clear and convincing evidence that respondents violated Rule 8.4.

Bar Counsel introduced substantial evidence to support the positions that Ms. Ackerman was incompetent and lacked capacity to make the decisions at issue in this case and that respondents knew or should have known that to be true.  But respondents introduced substantial evidence pointing in the opposite direction.  We assume for current purposes that the ultimate question of Ms. Ackerman's

competence or capacity is one of law, as to which this court would not owe deference to the Board or the Hearing Committee. *But cf. Butler v. Harrison*, 578 A.2d 1098, 1101 (D.C. 1990) (court of appeals will reverse trial court's finding that party was competent to contract only if finding was clearly erroneous). In our view, however, the resolution of that question in the present case turns on the weight to be given to the underlying factual evidence presented by Bar Counsel and the contrary factual evidence presented by respondents. On that indisputably factual issue, we see no basis upon which we could appropriately disregard the conclusions of the Hearing Committee and the Board. *Cf., e.g., In re Nace*, 98 A.3d 967, 974 (D.C. 2014) ("Where there is substantial evidence to support the agency's findings[,] the mere existence of substantial evidence contrary to that finding does not allow this court to substitute its judgment for that of the agency.") (brackets and internal quotation marks omitted).

Bar Counsel further argues that the Hearing Committee and the Board did not assess Ms. Ackerman's capacity with respect to each decision that she made, as required by *Butler*, 578 A.2d at 1100. To the contrary, we agree with the Board that "the Hearing Committee carefully analyzed whether Mrs. Ackerman had sufficient capacity at each of the discrete times she made decisions relevant to this case." Bar Counsel focuses in particular on respondents' actions in connection

with Ms. Ackerman's 2007 assignment to Dr. Ackerman of interests in the North Carolina Avenue property and other assets. Specifically, Bar Counsel argues that respondents acted dishonestly in connection with that transaction, because they were aware -- but did not disclose to the court -- that Dr. Ackerman had already filed a guardianship petition claiming that Ms. Ackerman was incompetent. Dr. Ackerman's guardianship petition, however, rested not on an assertion that Ms. Ackerman lacked mental capacity but rather on an assertion that Ms. Ackerman could not adequately conduct her affairs because of her blindness. Any failure to disclose Dr. Ackerman's subsequently withdrawn guardianship petition thus does not in our view amount to dishonest conduct rising to the level of a violation of Rule 8.4 (c).

## B.

Bar Counsel also contests the Board's conclusion that respondents did not violate the conflict-of-interest rules. Our analysis of this issue differs significantly from that of the Board, and we conclude that the matter should be remanded to the Board for further consideration of the issue.

**1.**

Under Rule 1.7 (b)(2), informed consent to joint representation is required if an attorney's representation of one client "will be or is likely to be adversely affected by representation" of the other client.[1]  In the Board's view, Mr. J.T. Szymkowicz correctly determined, after adequate inquiry, that Ms. Ackerman's interests and Dr. Ackerman's interests did not conflict.   Thus, the Board concluded, the Szymkowiczes were not required to obtain informed consent from Ms. Ackerman to the joint representation.  Whether the risks of joint representation are sufficient to require informed consent is a mixed question of law and fact.  *Cf. Wages v. United States*, 952 A.2d 952, 960 (D.C. 2008) (whether conflict of interest exists is mixed question of law and fact).  We therefore defer to the Board's purely factual findings but decide de novo the ultimate question whether informed consent was required.  *Cf., e.g.*, *In re Martin*, 67 A.3d 1032, 1039 (D.C. 2013) (court reviews de novo questions of law and ultimate fact).  We conclude that informed consent was required.

---

[1]   In 2005, when the Szymkowiczes began their representation of Ms. Ackerman, Rule 1.7 did not use the term "informed" to describe the requisite consent.  It appears to be undisputed, however, that the subsequent amendment of Rule 1.7 to include the term "informed" simply made explicit a preexisting implicit requirement.

We take as a given for these purposes the Board's conclusions that Ms. Ackerman had the legal capacity to make the decisions at issue; wanted to transfer her assets to Dr. Ackerman's control; wanted to provide for Dr. Ackerman, even to her financial detriment; did not want the trust to continue; did not want Mr. Abbott to continue as trustee; was willing to pursue litigation to achieve these objectives; and was aware of the risks and costs of litigation. Nevertheless, there was evidence (largely if not entirely undisputed) of numerous other circumstances indicating a risk of conflicting interests requiring informed consent to joint representation. For example, there was evidence that Ms. Ackerman had favorable feelings towards Mr. and Ms. Abbott; that Ms. Ackerman did not want litigation and wanted peace in the family; that Ms. Ackerman had granted Ms. Abbott a POA; that after granting Dr. Ackerman a POA, Ms. Ackerman promptly revoked that POA but then reversed course and again granted several POAs to Dr. Ackerman; that Ms. Ackerman agreed to the filing of *Ackerman II* with the understanding that Dr. Ackerman would drop *Ackerman I*, which Dr. Ackerman did not do; that the trust, which was primarily intended to support Ms. Ackerman, was running out of money to provide for Ms. Ackerman's care; and that Dr. Ackerman had indicated that, if the trust had to sell property, he wanted Ms. Ackerman's residence to be sold rather than the North Carolina Avenue property

where Dr. Ackerman lived. Moreover, it is undisputed that Ms. Ackerman's capacity was to at least some degree diminished by dementia.

Thus, even if Dr. Ackerman's interests and Ms. Ackerman's interests generally coincided, there was evidence indicating a substantial risk that those interests did or might diverge in particular respects relevant to the conduct of the joint representation. Such risks are not unique to the present case. To the contrary, such risks are common where one lawyer represents multiple family members in estate-planning matters, which is why Comment [20] to Rule 1.7 states that disclosure and informed consent "are usually required" in that setting. *See also* D.C. R. Prof. Conduct 1.7, Comment [7] (Rule 1.7's "underlying premise is that disclosure and informed consent are required if there is any reason to doubt the lawyer's ability to provide wholehearted and zealous representation of a client or if a client might reasonably consider the representation of its interests to be adversely affected [by representation of another client]. . . . [I]f an objective observer would have any reasonable doubt on the issue, the client has a right to disclosure of all relevant considerations and the opportunity to be the judge of its own interests."); D.C. Leg. Ethics Op. 301 (2000) ("[I]f an objective observer can identify and describe concrete ways in which one representation may reasonably be anticipated to interfere with the other, then a cognizable conflict arises under our rules, and

disclosure must be made and a waiver sought.") (internal quotation marks omitted); Carolyn L. Dessin, *Protecting the Older Client in Multi-generation Representations*, 38 Fam. L. Q. 247, 247, 268 (2004) ("Estate planning is a field in which attorneys often represent members of the same family of different generations. This frequently leads to situations in which the family members have conflicting, or at least potentially conflicting, financial interests. . . . Special concerns arise when one or more of the family members is in a declining physical or mental state as a result of aging. In that instance, an attorney must be even more sensitive to representing all of [the attorney's] clients zealously and avoiding conflicts of interest between [the attorney's] clients."; "A better approach is to inform fully each client about the potential for future conflict and obtain the informed consent of each client to the representation."); *cf. In re McMillan*, 940 A.2d 1027, 1036 (D.C. 2008) ("The trial court could conclude on this record, as it did, that a lawyer who represented appellant's parents would have a conflict of interest in representing zealously the interests of their son upon whom they depended for support.").

In the circumstances of this case, we conclude that the Szymkowiczes could not properly represent both Ms. Ackerman and Dr. Ackerman without obtaining informed consent to the joint representation. Because it concluded that informed

consent was not required, the Board did not decide whether informed consent was obtained. The Hearing Committee did conclude that Mr. J.T. Szymkowicz obtained Ms. Ackerman's informed consent. Nevertheless, "[r]ather than deciding [that] issue without the benefit of the Board's judgment, we leave [the issue] for the Board to consider on remand . . . ." *In re Hopkins*, 677 A.2d 55, 63 n.17 (D.C. 1996).[2] We do, however, note several issues that may merit the Board's consideration: (1) whether, as Bar Counsel contends, respondents bear the burden of establishing that they obtained informed consent or whether instead Bar Counsel bears the burden in disciplinary proceedings of establishing the absence of informed consent; (2) whether, as the Hearing Committee appears to have assumed, the determination whether Ms. Ackerman gave informed consent should be made under the standard applicable to the determination whether a party had capacity to engage in a transaction; (3) whether Rule 1.7 (b)(2) is violated whenever the requisite informed consent is not in fact obtained, or whether instead it is a defense under the Rule that the attorney reasonably but mistakenly believed that informed consent had been obtained; (4) the implications of Rule 1.14, which

---

[2] The Board ruled in the alternative that Mr. J.P. Szymkowicz did not violate the conflict-of-interest rule because he reasonably relied on Mr. J.T. Szymkowicz's assurances that any conflict issues had adequately been addressed. Because it is possible that the Board's assessment of that issue could be affected by the Board's determinations on remand, we also remand as to the conflict-of-interest charge against Mr. J.P. Szymkowicz.

addresses the obligations of a lawyer representing a client with diminished capacity, a topic we discuss infra with respect to the conflict-of-interest charges against Ms. Silverman and Mr. King; and (5) the date on which the Szymkowiczes ended their representation of Ms. Ackerman.[3]

**2.**

In determining that Dr. Ackerman's influence over Ms. Silverman and Mr. King did not raise a conflict-of-interest issue, the Board relied heavily on the conclusion that Dr. Ackerman's interests generally coincided with Ms. Ackerman's interests. We have already explained our disagreement with that approach. We have additional concerns, however, about the reliance Ms. Silverman and Mr. King

---

[3] On the last issue, Mr. J.T. Szymkowicz testified that the representation ended on March 7, 2007, and both the Hearing Committee and the Board majority appear to have accepted that testimony without discussion. Bar Counsel suggests, however, that although the Szymkowiczes withdrew as counsel in *Ackerman II* on that date, they did not at that time generally withdraw from their representation of Ms. Ackerman. The concurring Board members viewed the date of withdrawal from the representation as unclear, and counsel for the Szymkowiczes acknowledged at oral argument that the precise date on which the representation ended was not clear. We are inclined to agree that the date of withdrawal from the representation is unclear. Determining the date of withdrawal from the representation is potentially relevant to the conflict-of-interest issue, because the Hearing Committee and Board did not appear to consider conduct after March 7, 2007, as relevant to whether the Szymkowiczes violated the conflict-of-interest rule.

placed on the fact that Dr. Ackerman had been granted POAs by Ms. Ackerman. Apparently in reliance on the POAs, Ms. Silverman and Mr. King took numerous significant steps in their representation of Ms. Ackerman without consulting Ms. Ackerman. To take just one example, Ms. Silverman discussed with Dr. Ackerman the assignment of the North Carolina Avenue property and other assets to Dr. Ackerman, and subsequently defended the validity of the assignment. Nevertheless, Ms. Silverman apparently did not discuss that assignment with Ms. Ackerman. The heavy reliance by Ms. Silverman and Mr. King on the POAs in this case is troubling for several reasons.

First, Ms. Ackerman's mental capacity was indisputably diminished to a degree. Under Rule 1.14 (a), Ms. Silverman and Mr. King were required to, "as far as reasonably possible, maintain a typical client-lawyer relationship" with Ms. Ackerman. As the commentary to that Rule explains, that requirement applies even if a surrogate decisionmaker, such as a POA holder, exists. D.C. R. Prof. Conduct 1.14, Comment [2] ("The fact that a client suffers a disability does not diminish the lawyer's obligation to treat the client with attention and respect. Even if the person has a surrogate decision-maker, the lawyer should as far as possible accord the represented person the status of a client, particularly in maintaining communication."); *cf., e.g.*, *Buras v. Ace Dynasty*, 731 So. 2d 1010, 1012-13 (La.

Ct. App. 1999) ("[W]e are not persuaded that . . . the power of attorney executed by [the client] in favor of [the POA holder], disposed of [the lawyer's] responsibility to communicate with his client . . . ."). Relatedly, we agree with Bar Counsel that Rule 1.14, which is intended in substantial part to provide additional protections to clients with diminished capacity, is not properly read as generally altering the responsibility of attorneys to obtain the requisite informed consent before undertaking joint representation presenting a risk of conflicting interests. *Cf., e.g.*, *Dayton Bar Ass'n v. Parisi*, 965 N.E.2d 268, 273 (Ohio 2012) (per curiam) ("[W]hen taking actions authorized by [Rule 1.14], the lawyer must still determine whether the representation of one client will be directly adverse to the other and whether there is a substantial risk that the lawyer's ability to consider, recommend, or carry out an appropriate course of action for one client will be materially limited by the lawyer's responsibilities to another client.").

Second, although Comment [4] to Rule 1.14 states that an attorney can ordinarily look to a surrogate decision-maker for decisions on behalf of the client, the circumstances of this case were not ordinary. The holder of a POA generally has fiduciary obligations to the person who granted the POA. *See, e.g.*, Restatement (Third) of Agency §§ 1.04(7) (POA holder is agent), 8.01 (agent generally has fiduciary obligation to principal) (2008). Although this court does

not appear to have addressed the issue, many states presumptively prohibit POA holders from relying on a POA to make property transfers to the POA holder. *See, e.g.*, *Losee v. Marine Bank*, 703 N.W.2d 751, 752-53 (Wis. Ct. App. 2005) (Wisconsin law "prohibits self-dealing not specifically permitted in the POA"); *see generally, e.g.*, Carolyn L. Dessin, *Acting as Agent Under a Financial Durable Power of Attorney: An Unscripted Role*, 75 Neb. L. Rev. 574, 612 (1996) ("Many states have held that an agent [including a POA holder] cannot make a gift of the principal's property to himself unless the governing instrument expressly gives the power to make gifts."). The fact that the transactions at issue involved self-dealing by Dr. Ackerman added to the risks of conflict created when Ms. Silverman and Mr. King took payment and direction from Dr. Ackerman while representing Ms. Ackerman. *Cf., e.g.*, Kenneth L. Jorgenson, *When a Beneficiary Asks You to Draft a Will*, 60-SEP Bench & B. Minn. 11, 12 (2003) ("A lawyer's disproportionate reliance upon a beneficiary for testamentary instructions begs conflict of interest claims and expands the opportunity for undue influence challenges."); Carolyn L. Dessin, *Protecting the Older Client in Multi-generation Representations*, 38 Fam. L. Q. 247, 264 (2004) (lawyer representing grantor of POA "must be careful to ascertain that he is carrying out [grantor's] wishes").

For these reasons, we conclude that there was a substantial risk of conflicting interests arising from Ms. Silverman's and Mr. King's connections to Dr. Ackerman while they were representing Ms. Ackerman. Because the Board concluded otherwise, it did not address whether Ms. Silverman and Mr. King obtained informed consent from Ms. Ackerman. We leave that issue to be addressed on remand.

*     *     *     *     *

For the foregoing reasons, we accept the Board's finding that Mr. King violated Rule 1.5 (b) by failing to obtain a written retainer agreement; we accept the Board's recommendation that the Rule 1.5 (b) violation by itself would warrant an informal admonition; we accept the Board's recommendation to dismiss the charged violations of Rule 8.4; and we remand the matter to the Board for further consideration of the conflict-of-interest charges against all respondents.[4]

*So ordered.*

---

[4] Bar Counsel does not contest before this court the Board's determination that respondents did not violate Rules 1.6 and 1.16. We therefore do not address that determination. *See, e.g.*, *In re Ray*, 675 A.2d 1381, 1385 n.2 (D.C. 1996) ("Bar Counsel does not challenge this [conclusion of Board] and we do not address it.").