*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

DISTRICT OF COLUMBIA COURT OF APPEALS

No. 17-BG-767

IN RE SETH ADAM ROBBINS, RESPONDENT.

A Member of the Bar
of the District of Columbia Court of Appeals
(Bar Registration No. 471812)

On Report and Recommendation
of the Board on Professional Responsibility
(Board Docket No. 15-BD-118)
(BDN-431-13)

(Argued May 17, 2018                    Decided   August 30, 2018)

*Arthur D. Burger* for respondent.

*Hamilton P. Fox, III*, Disciplinary Counsel, with whom *Julia L. Porter*, Senior Assistant Disciplinary Counsel, was on the brief, for the Office of Disciplinary Counsel.

Before FISHER, BECKWITH, and MCLEESE, *Associate Judges*.

PER CURIAM:   The Board on Professional Responsibility (the Board) recommends that respondent Seth Adam Robbins be suspended for sixty days from the practice of law and, prior to reinstatement, complete four hours of ethics-related Continuing Legal Education (CLE) because of clear and convincing evidence that Mr. Robbins failed to keep a client reasonably informed about the

status of a matter, represented the client despite the likelihood that such representation would be adversely affected by Mr. Robbins's representation of another client, and represented the client where Mr. Robbins's professional judgment might reasonably have been affected by his interest in a business related to the underlying matter. D.C. R. Prof. Conduct 1.4 (a), 1.7 (b)(2), 1.7 (b)(4). We hold that the record supports the Board's conclusions and accept the Board's recommendation.

## I.

Mr. Robbins was admitted to the District of Columbia Bar in May 2001 and has no record of professional discipline. At the time of the alleged misconduct, he was a partner at a law firm and responsible for one of the firm's clients, Persaud Companies, Inc. (Persaud), a government contractor and construction company founded and owned by its CEO Andy Persaud. This case arose when Mr. Robbins invited his friend and client, Gary Day, to serve as an indemnitor for Persaud's surety bonds on future projects. The evidence presented to the Hearing Committee was as follows.

Hudson Insurance Company had previously served as surety on Persaud's government contracts, issuing payment and performance bonds. In 2011, Persaud asked Hudson to furnish bonds on future construction projects, but Persaud was

unable to produce certified audited financial statements.  Hudson thus agreed to remain as surety on future projects but on two conditions.  First, Hudson wanted Persaud to engage an escrow agent to receive and disburse funds from the government agencies with which it contracted. Hudson suggested Chesapeake Escrow Services, which Mr. Robbins had formed with his sister earlier that year. Chesapeake agreed and Mr. Robbins formally disclosed his conflict of interest to gain consent for his representation.

Second, Hudson wanted Persaud to add a third indemnitor.  In the past, Persaud and Andy Persaud had served as indemnitors for Hudson.  Mr. Robbins knew Gary Day through the work Mr. Robbins's firm had done for Mr. Day's family and the work Mr. Robbins had done for Mr. Day, and Mr. Robbins and Mr. Day had since become friends.  Mr. Robbins approached Mr. Day about this opportunity and explained that the requirement of an additional indemnitor was the result of Andy Persaud's need to rearrange funds, but assured Mr. Day that Persaud and Andy Persaud had sufficient assets to protect Mr. Day in the event that Hudson paid a claim and sought indemnification.  Mr. Day testified that he was not aware of Mr. Robbins's interest in Chesapeake, whereas Mr. Robbins testified that Mr. Day was aware because Mr. Day had seen the escrow agreements.

According to his testimony, Mr. Day understood that Mr. Robbins would

represent Mr. Day's interests in negotiating the terms of the indemnification agreement. Specifically, Mr. Day expected Mr. Robbins to ensure that the agreement included a provision that if Persaud failed to perform on a contract and Hudson had to pay out its bonds, Hudson would look to Persaud and Andy Persaud before turning to Mr. Day.  In addition, Mr. Day requested a provision that would require his explicit approval before he indemnified future contracts, as well as a provision that both he and Mr. Robbins would be notified of any future indemnifications. Mr. Robbins successfully negotiated the second two terms with Hudson, but did not obtain the provision in the agreement that would ensure that Hudson looked to Persaud and Andy Persaud before turning to Mr. Day.[1]  Mr. Day explained that, based on reassurances from Mr. Robbins, he signed the indemnity agreement without reading or understanding it, and did so again with each revised copy Mr. Robbins sent him.  Mr. Day did not feel the need to read the documents carefully because he trusted Mr. Robbins and "didn't know enough about this stuff."  Throughout this time, Mr. Day believed Mr. Robbins was his lawyer, despite never receiving an invoice for Mr. Robbins's services.

Over time, Mr. Robbins learned that Persaud may be having financial

---

[1]    Although the final indemnification agreement did not contain this provision, Mr. Robbins memorialized the provision in an email to Gary Day following negotiations.

problems. In February 2012 Chesapeake loaned Persaud close to $1 million from its escrow account but did not receive immediate repayment. Later that year, Persaud fell behind on its performance on one of the contracts on which Mr. Day was an indemnitor, became subject to a federal criminal investigation, and stopped escrowing funds with Chesapeake as required by its agreement with Hudson. Mr. Robbins did not convey any of this information to Mr. Day. In July 2012 a lawyer for Hudson named Richard Pledger sent Mr. Day a demand letter because Persaud was failing to pay its bills on certain projects, resulting in claims against the surety bonds for $1,215,242. Mr. Day emailed Mr. Robbins the letter. Mr. Robbins replied, "It's all good . . . . I am working out with Hudson. You do not need to be concerned," and Mr. Day wrote back, "Yeah, figured. Thanks for the update." The two also spoke over the phone.

Over the next few months, Mr. Robbins continued to communicate with Richard Pledger about the claims against the surety bonds. In September, Mr. Pledger sent Mr. Robbins a draft complaint that named Mr. Day as one of the defendants, but did not send the draft to any of the indemnitors. Mr. Robbins informed Mr. Pledger that he had no objection to Mr. Pledger contacting Andy Persaud directly, but as to Mr. Day, Mr. Robbins told Mr. Pledger that he was going to communicate with Mr. Day and keep him apprised. Days later, in an email copied to Mr. Persaud but not Mr. Day, Mr. Robbins informed Mr. Pledger

that "[m]oving forward, to the extent Hudson does in fact file suit against Persaud and Gary Day, please be aware that I will no longer be engaged in the discussions between Persaud and Hudson—because of a conflict of interest." Mr. Pledger understood the conflict Mr. Robbins mentioned to mean a conflict between Mr. Robbins's two clients, Mr. Day and Andy Persaud, though Mr. Robbins testified that he was referring to a conflict relating to his interest in Chesapeake. Mr. Pledger followed up with an email confirming, among other things, Mr. Robbins's permission that Mr. Pledger could communicate directly with Andy Persaud. Mr. Robbins did not provide Mr. Day with a copy of the draft complaint nor inform him of the draft's existence.

In January 2013, Mr. Pledger, on behalf of Hudson, filed suit against Persaud, Andy Persaud, and Mr. Day, and sent a letter to the parties informing them that he was delaying service in hopes of working out a resolution. The letter referred to Mr. Robbins as their "former counsel." Mr. Pledger sent the letter to Mr. Day directly because of Mr. Robbins's statement that he would not be involved after a suit was filed because of a conflict of interest. Days later, Mr. Robbins texted Mr. Day to say "[t]he Persaud crap is not good . . . . I think you are going to need to hire an atty to deal with the surety." Mr. Day said he understood this to mean that he needed to hire an attorney who specialized in surety bond litigation, not that Mr. Robbins had never represented Mr. Day in any capacity

with regard to the indemnity agreement. Mr. Day ultimately hired an attorney and paid $1.7 million to resolve the litigation.

Disciplinary Counsel filed a petition and specification of charges against Mr. Robbins in December 2015 and a hearing was held before the Hearing Committee. The Hearing Committee concluded that Mr. Robbins had entered into an attorney-client relationship with Mr. Day and that he violated D.C. R. Prof. Conduct 1.7 (b)(2) (because his representation of Mr. Day had likely been adversely affected by his representation of Persaud), Rule 1.7 (b)(4) (because his professional judgment on behalf of Mr. Day was adversely affected by his own interest in Chesapeake), and Rule 1.4 (a) (because during the representation of Mr. Day, he failed to keep Mr. Day reasonably informed about developments in the matter). The Committee recommended a sixty-day suspension and a four-hour CLE requirement for reinstatement.

After Disciplinary Counsel filed its specification of charges, Virginia Bar Counsel filed identical charges against Mr. Robbins in Virginia, where Mr. Robbins was also a member of the bar. The parties in Virginia submitted the record created in the proceedings before the D.C. Hearing Committee, including the Hearing Committee's final report and recommendation, to a three-judge panel in Virginia—the final arbiter of disciplinary proceedings in that jurisdiction.

Without hearing any live testimony, the Virginia court dismissed the case with prejudice upon determining that the evidence of an attorney-client relationship between Mr. Robbins and Mr. Day fell short of clear and convincing evidence, "but barely so." The D.C. Board on Professional Responsibility declined to give the Virginia determination preclusive effect and adopted the Hearing Committee's conclusions and recommended sanction.

## II.

Mr. Robbins takes exception to the finding of an attorney-client relationship between him and Mr. Day, the findings of professional misconduct, the Board's decision not to adopt Virginia's recommended sanction, and, in the event we agree with the Board's findings, the recommended disciplinary sanction.

### A.    Attorney-Client Relationship

At the outset, Mr. Robbins argues that the Board erred by finding an attorney-client relationship between Mr. Robbins and Mr. Day.   Mr. Robbins argues that the Board erred in concluding that such a relationship existed by ignoring important exculpatory evidence and unfairly construing some of the evidence to the disadvantage of Mr. Robbins.   When reviewing a disciplinary proceeding, we "accept the findings of fact made by the Board unless they are unsupported by substantial evidence of record."  D.C. Bar R. XI § 9 (h)(1).  *E.g.*,

*In re Fay*, 111 A.3d 1025, 1029 (D.C. 2015) (per curiam) (applying this standard to the review of a finding that an attorney-client relationship existed); *In re Bernstein*, 707 A.2d 371, 375 (D.C. 1998) (same); *In re Roundtree*, 467 A.2d 143, 146 nn.8–9 (D.C. 1983) (per curiam) (same).[2]

Whether an attorney-client relationship existed depends on the circumstances of each case. *See, e.g.*, *In re Bernstein*, 707 A.2d at 375; *In re Lieber*, 442 A.2d 153, 156 (D.C. 1982). "[N]either a written agreement nor the payment of fees is necessary to create an attorney-client relationship. *In re Lieber*, 442 A.2d at 156. All that is needed "is that the parties[,] explicitly or by their conduct, manifest an intention to create" the relationship. *In re Dickens*, 174 A.3d 283, 296 (D.C. 2017) (quoting *In re Ryan*, 670 A.2d 375, 379 (D.C. 1996) (internal

---

[2] Mr. Robbins argues that the finding of an attorney-client relationship is an "ultimate fact" that should be reviewed de novo, and that "the different factual circumstances in this case from the facts in any of the D.C. cases" further compel de novo review. Yet inherent in the Hearing Committee's role as factfinder—including on the question whether there existed an attorney-client relationship—are determinations of credibility as to each testifying witness, which we accord deference. *See, e.g.*, *In re Bradley*, 70 A.3d 1189, 1193 (D.C. 2013); *In re Temple*, 629 A.2d 1203, 1208–09 (D.C. 1993); *In re Roundtree*, 467 A.2d at 146 n.9. Respondent does not explain how de novo review would allow this court to supplant the Hearing Committee's credibility determinations or why, simply because the attorney-client relationship is an important fact, this court is better equipped to make findings ordinarily designated to the initial factfinder. Moreover, that the facts may differ from case to case is not a sufficient reason, on its own, to abandon our longstanding substantial evidence standard for reviewing this issue.

quotation marks omitted)). Although the client's perception of the relationship is relevant, it is not dispositive. *See In re Dickens*, 174 A.3d at 297; *In re Fay*, 111 A.3d at 1030.

The Hearing Committee credited Mr. Day's testimony about his understanding of his relationship with Mr. Robbins based on Mr. Day's credible demeanor and other facts in the record supporting the conclusion that Mr. Day's belief was reasonable. For instance, the Hearing Committee found that Mr. Robbins had a history of representing Mr. Day in other business deals. After presenting the opportunity to sign on as an indemnitor to Mr. Day, Mr. Robbins negotiated part of the indemnification agreement on Mr. Day's behalf and memorialized it before sending Mr. Day a copy for his review. Mr. Day only signed the agreement upon confirming with Mr. Robbins that he should do so. When Mr. Pledger sent a demand letter on behalf of Hudson to Mr. Day, Mr. Day contacted Mr. Robbins and took no action upon Mr. Robbins's assurances that Mr. Day need not worry. Richard Pledger's perspective on these matters was likewise central to the Hearing Committee's conclusion. When Mr. Pledger asked Mr. Robbins whether he (Mr. Pledger) could communicate directly with Mr. Day, Mr. Robbins said no, but allowed Mr. Pledger to reach out to Andy Persaud. Mr. Robbins also informed Mr. Pledger that a conflict of interest would prevent him from representing Mr. Day if Hudson were to file a lawsuit.

As the Board and Hearing Committee recognized, not all facts supported the existence of an attorney-client relationship. Among other examples, Mr. Day did not explicitly ask Mr. Robbins to represent him, no formal document established an attorney-client relationship, Mr. Day did not pay Mr. Robbins for his services in this matter, he knew that Mr. Robbins was representing Persaud, and Mr. Robbins testified credibly that he did not believe he was doing legal work for Mr. Day. Mr. Robbins contends that the Hearing Committee failed to acknowledge eleven additional exculpatory facts, as did the Board in its review of the Committee's findings. But the Hearing Committee is not required to enumerate every fact that has possible relevance to an issue in its report. *See, e.g.*, *Sturgis v. District of Columbia Dep't of Emp't Servs.*, 629 A.2d 547, 554 (D.C. 1993). Its job is to ensure that each finding is supported by clear and convincing evidence,[3] and on review, this court will uphold those findings, as we do here, where there is substantial evidence to support them—even where evidence may support a contrary view as well. *See In re Szymkowicz*, 124 A.3d 1078, 1084 (D.C. 2015) (per curiam); *see also In re Nace*, 98 A.3d 967, 974 (D.C. 2014) (per curiam).[4]

---

[3] *See, e.g.*, *In re Slattery*, 767 A.2d 203, 208 (D.C. 2001) ("The burden of proving the charges rests with Bar Counsel and factual findings must be supported by clear and convincing evidence.").

[4] Mr. Robbins additionally urges us to "adopt and apply" a standard articulated in a provision of the Restatement (Third) of the Law Governing

(continued…)

Furthermore, although Mr. Day did not pay Mr. Robbins for this specific transaction, Mr. Robbins had never had a written fee arrangement with Mr. Day, despite having formally represented him in other matters. Mr. Day also testified that in this matter, he and Mr. Robbins had discussed payment, but Mr. Robbins had indicated that he would be compensated based on his other roles in the transaction.

Because substantial evidence supports the finding that Mr. Robbins entered into an attorney-client relationship with Mr. Day, Mr. Robbins was obliged to exercise all ethical duties arising out of that relationship. Although Mr. Robbins filed an exception to the Board's findings of professional misconduct, he does not meaningfully challenge these findings on appeal. We conclude that substantial evidence supports each violation.

Rule 1.4 (a) provides that "[a] lawyer shall keep a client reasonably informed about the status of a matter and promptly comply with reasonable

---

(…continued)

Lawyers § 14 and similarly in Comment 9 to D.C. R. Prof. Conduct 1.6, which states that "most of the duties flowing from the client-lawyer relationship attach only after the client has requested the lawyer to render legal services and the lawyer has agreed to do so." We do not read this provision or the language in the Restatement as requiring more than the standard already articulated. As stated above, the client's request and attorney's acceptance need not be explicitly made, but may be inferred from context if substantial evidence supports a finding of such a relationship.

requests for information." Accordingly, a lawyer must initiate communication where necessary and fulfill his client's reasonable expectations for information. *See In re Hallmark*, 831 A.2d 366 (D.C. 2003); *In re Schoeneman*, 777 A.2d 259, 264 (D.C. 2001). The evidence showed that Mr. Robbins failed to apprise Mr. Day of developments involving Persaud's financial and performance problems that may have allowed Mr. Day to make informed decisions to protect his interests. That is, Mr. Robbins did not inform Mr. Day that Persaud had fallen behind performing on a contract on which Mr. Day was an indemnitor, that Persaud at some point stopped escrowing funds that its agreement required, that Chesapeake advanced funds to Persaud to meet payroll, or that Mr. Robbins had been sent a draft complaint that named Mr. Day as a defendant.

Rule 1.7 (b)(2) provides that "a lawyer shall not represent a client with respect to a matter if . . . [s]uch representation will be or is likely to be adversely affected by representation of another client."[5] Mr. Robbins represented both

---

[5] Both Rule 1.7 (b)(2) and 1.7 (b)(4) are qualified by conditions described in Rule 1.7 (c), which provides that a lawyer may nevertheless represent a client in a scenario covered by Rule 1.7 (b) if "each potentially affected client provides informed consent to such representation after full disclosure of the existence and nature of the possible conflict and the possible adverse consequences of such representation" and "the lawyer reasonably believes that the lawyer will be able to provide competent and diligent representation to each affected client." As the Hearing Committee found, Mr. Robbins did not obtain Mr. Day's informed consent.

Persaud and Mr. Day in the same matter, and at the outset knew that Persaud's failure to perform could negatively affect Mr. Day. Rather than withdraw from representation when Mr. Robbins learned that Persaud was having financial and performance problems, Mr. Robbins failed to take action or communicate with Mr. Day.

Finally, Rule 1.7 (b)(4) provides that "a lawyer shall not represent a client with respect to a matter if . . . [t]he lawyer's professional judgment on behalf of the client will be or reasonably may be adversely affected by the lawyer's responsibilities to or interests in a third party or the lawyer's own financial, business, property, or personal interests."[6] Mr. Robbins founded Chesapeake and had a financial and business interest in Chesapeake, meaning that he benefited financially each time Chesapeake was paid a fee to escrow funds. It was therefore in Mr. Robbins's interest to keep Mr. Day on as an indemnitor on Persaud's contracts, and he had an incentive not to inform Mr. Day of any problems Persaud began to experience.

In sum, substantial evidence from the record supports the Hearing Committee's finding of each violation.

---

[6] See *supra* note 5.

## B. Effect of the Virginia Decision

Mr. Robbins argues that the Hearing Committee's findings aside, the Board was obligated by principles of collateral estoppel to defer to the Virginia court's final adjudication that Mr. Robbins had not entered into an attorney-client relationship with Mr. Day.

The doctrine of collateral estoppel renders conclusive an issue of fact or law essential to a determination where there has been a final judgment on the merits that has been actually litigated by the same parties or their privies. *E.g.*, *In re Wilde*, 68 A.3d 749, 759 (D.C. 2013). Whether these requirements are met is a legal issue that we review de novo. *Modiri v. 1342 Rest. Grp., Inc.*, 904 A.2d 391, 394 (D.C. 2006). Missing here is privity between Disciplinary Counsel and its Virginia counterpart. Privies are sometimes described as "those who control an action although not parties to it; those whose interests are represented by a party to an action; and successors in interest." *Carr v. Rose*, 701 A.2d 1065, 1075 (D.C. 1997) (quoting *Smith v. Jenkins*, 562 A.2d 610, 615 (D.C. 1989)). Mr. Robbins argues that Disciplinary Counsel was effectively in privity with Virginia's Bar Counsel because the two are members of the National Organization of Bar Counsel and share a common goal of disciplining attorneys who violate rules central to the conduct of the profession. But as highlighted by Disciplinary Counsel, there is no

evidence that Disciplinary Counsel participated in the Virginia proceedings or coordinated with Virginia's Bar Counsel to present consistent arguments. This is especially significant where no live witnesses testified in the Virginia proceedings; the Virginia court merely considered the cold record of the proceedings before the Hearing Committee in D.C.

Moreover, the doctrine of collateral estoppel arose because "the public interest in judicial economy and in ending repetitious litigation dictates that it would be unjust to permit one who has had his day in court to reopen identical issues by merely switching adversaries." *Jackson v. District of Columbia*, 412 A.2d 948, 953 (D.C. 1980) (internal quotation marks omitted). This rationale applies with less force where there has already been a full hearing on the merits in our jurisdiction, and all that awaits is a final decision based on that record. *See In re Perrin*, 663 A.2d 517, 523 (D.C. 1995) (holding that "where the Hearing Committee had already held an evidentiary hearing" before the attorney was disbarred elsewhere, "it simply makes no sense to disregard the Committee's findings and the Board's recommendation in favor of the other jurisdiction's sanction"); *In re Cerroni*, 683 A.2d 150, 151 (D.C. 1996) (per curiam) (agreeing with the Board that we were not required to enter reciprocal discipline where our Hearing Committee had held a hearing before the subject attorney was suspended elsewhere). The Virginia court based its decision on the identical record made

before the Hearing Committee, albeit without the benefit of live testimony. *Cf. In re Zilberberg*, 612 A.2d 832, 835 (D.C. 1992) (holding that a record must be augmented, ordinarily by a de novo hearing before the Hearing Committee, where an existing record from an original disciplining jurisdiction is insufficient for establishing a greater sanction is warranted); *see also Doe v. Georgetown Ctr. (II), Inc.*, 708 A.2d 255, 256–57 (D.C. 1998) (affording deference to the adjudicator who has the opportunity to observe witnesses and consider evidence "in the context of a living trial rather than upon a cold record" (quoting *Hughes v. Pender*, 391 A.2d 259, 263 (D.C. 1978))). In reaching its final decision, the Virginia court concluded simply that local Bar Counsel had not proven by clear and convincing evidence that an attorney-client relationship existed, but offered no analysis to support its conclusion. Rather, the court stated only that it found "that the evidence falls short, but barely so."

For these reasons—Disciplinary Counsel's lack of participation in the Virginia proceeding, the Virginia Court's reliance on an inferior record, and the Hearing Committee's full hearing on the violations before Virginia's decision—the Virginia decision is not entitled to preclusive effect.[7]

---

[7] Mr. Robbins further argues that the Board should have given deference to the Virginia decision pursuant to principles of full faith and credit and comity. Our

(continued…)

## C.    Sanction

Having concluded that the Board's findings are supported by substantial evidence and that we are not bound to apply Virginia's decision, we turn to the question of the appropriate sanction. We adopt the Board's recommended sanction "unless to do so would foster a tendency toward inconsistent dispositions for comparable conduct or would otherwise be unwarranted." D.C. Bar R. XI, § 9 (h)(1); *see also In re Cleaver-Bascombe*, 986 A.2d 1191, 1194 (D.C. 2010) (per curiam) (applying the same standard). We also consider a number of factors, including the seriousness of the conduct, prejudice to the client resulting from the conduct, whether the conduct involved dishonesty, violations of more than one disciplinary rule, the attorney's disciplinary history, whether the attorney has acknowledged the misconduct, and other mitigating or aggravating circumstances. *See, e.g.*, *In re Martin*, 67 A.3d 1032, 1053 (D.C. 2013) (citing *In re Elgin*, 918 A.2d 362, 376 (D.C. 2007)).

---

(…continued)
conclusion that the Virginia decision is not entitled to preclusive effect under the doctrine of collateral estoppel does not mean that we will not defer to final decisions in other jurisdictions' disciplinary proceedings. We reach this conclusion because, under the unique circumstances presented in this case, it would be neither fair nor efficient to adopt the Virginia court's conclusion rather than the Board's. For these same reasons, we are not persuaded by Mr. Robbins's invocation of comity, full faith and credit, or any other similar principle.

We have on numerous occasions imposed suspensions of sixty days and longer for conflict-of-interest rule violations. *E.g.*, *In re Shay*, 756 A.2d 465 (D.C. 2000) (per curiam) (ninety-day suspension for violation of Rules 1.7 (b)(2) and (b)(4), 1.16 (a), and 8.4 (c)); *In re Evans*, 902 A.2d 56 (D.C. 2006) (per curiam) (six-month suspension for violation of Rules 1.1 (a) and (b), 1.7 (b)(4), and 8.4 (d)); *In re Elgin*, 918 A.2d 362 (six-month suspension for violation of Rules 1.2 (a), 1.3 (b)(2), 1.4 (a), 1.7 (b)(4), 1.8 (a), and 8.4 (d)). We nonetheless agree with the Board's conclusion that Mr. Robbins's conduct was less serious than in two of these cases, *Evans*, 902 A.2d at 73–79, and *Elgin*, 918 A.2d at 376–84, which each involved more serious rule violations and significant aggravating factors. By adopting the Hearing Committee's analysis, the Board here recognized several factors in Mr. Robbins's favor, including his otherwise unblemished disciplinary history, the relatively small number of rule violations, the lack of evidence of Mr. Robbins's dishonesty, and Mr. Robbins's subjective belief that he was not doing legal work for Mr. Day.

Mr. Robbins contends, however, that the Board and Hearing Committee gave short shrift to the finding that he did not believe that he was doing legal work for Mr. Day. Specifically, Mr. Robbins argues that because the Hearing Committee credited his belief that he did not believe he was doing legal work for Mr. Day, and likewise found that Mr. Robbins was not being dishonest, then Mr.

Robbins could not have intentionally violated any of the conflict-of-interest rules. Contrary to Mr. Robbins's assertion, we do not equate the Hearing Committee's finding with the conclusion that Mr. Robbins necessarily acted only negligently in committing the conduct underpinning each rule violation. The Committee made the finding that Mr. Robbins highlights in the course of evaluating aggravating or mitigating factors relevant to the appropriate sanction, rather than in the context analyzing the conduct underpinning the found rule violations.

We therefore conclude that the sixty-day suspension recommended in this case is consistent with the discipline imposed in comparable cases and is not otherwise unwarranted.

## III.

For the foregoing reasons, we adopt the recommendation of the Board and order that Mr. Robbins be suspended from the practice of law in the District of Columbia for a period of sixty days, effective thirty days from the date of this opinion. We direct Mr. Robbins's attention to Rule XI § 14, governing the responsibilities of suspended attorneys. We further order that, as a condition of reinstatement, Mr. Robbins take four hours of ethics CLE during or before the period of suspension and file with the Board and Disciplinary Counsel a certification that he has completed this requirement.

*So ordered.*