*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

DISTRICT OF COLUMBIA COURT OF APPEALS

No. 19-BG-0702

IN RE JINHEE K. WILDE, RESPONDENT.

A Suspended Member of the Bar
of the District of Columbia Court of Appeals
(Bar Registration No. 436659)

On Report and Recommendation
of the Board on Professional Responsibility
(Disciplinary Docket No. 2009-D244)
(Board Docket No. 14-BD-67)

(Argued June 25, 2020                    Decided August 17, 2023)

*Michael L. Rowan* for appellant.

*Julia L. Porter*, Assistant Disciplinary Counsel, with whom *Hamilton P. Fox, III*, Disciplinary Counsel, and *Myles V. Lynk*, Senior Assistant Disciplinary Counsel, were on the brief, for the Office of Disciplinary Counsel.

Before BECKWITH and EASTERLY, *Associate Judges*, and GLICKMAN,* *Senior Judge*.

BECKWITH, *Associate Judge*: The District of Columbia Board on Professional

---

* Judge Glickman was an Associate Judge at the time of argument. His status changed to Senior Judge on December 21, 2022.

Responsibility (the Board) recommended that Ms. Jinhee Wilde be disbarred after a South Korean court convicted her of larceny. The Incheon District Court in Incheon, South Korea found Ms. Wilde guilty of stealing $1,100 from another passenger on her flight to South Korea. The D.C. Office of Disciplinary Counsel (at the time called Office of Bar Counsel) instituted proceedings against Ms. Wilde for violating eight Rules of Professional Conduct related to theft, fraud, forgery, making false statements, and uttering false evidence. An Ad Hoc Hearing Committee recommended disbarment after finding by clear and convincing evidence that Ms. Wilde had committed theft and forgery, but it declined to find that she engaged in fraud. The Board adopted the Hearing Committee's findings of fact and recommended disbarment.

Both Disciplinary Counsel and Ms. Wilde filed exceptions to the Board's report and recommendation.[1] Ms. Wilde contends that the Hearing Committee and the Board should have given preclusive effect to a Maryland Circuit Court judgment that found that Ms. Wilde neither committed the theft nor forged documents. She also challenges, on various grounds, the Board's adoption of the Hearing Committee's findings of fact. Finally, she argues that the Board should have

---

[1] After an order to show cause, this court suspended Ms. Wilde from the practice of law in the District of Columbia pending final disposition of this proceeding. *See* D.C. Bar R. XI, § 9(g).

recommended a less severe sanction than disbarment. We conclude that the Hearing Committee was not required to give preclusive effect to the Maryland judgment; and because we are not persuaded by Ms. Wilde's additional arguments, we agree with the Board's recommendation and disbar Ms. Wilde from the practice of law in the District of Columbia.

Disciplinary Counsel argues that the Board incorrectly determined that Ms. Wilde had committed only one of the three criminal acts charged under Rule 8.4(b). Specifically, the Board concluded that Ms. Wilde had committed theft, but that Disciplinary Counsel failed to prove that she had committed fraud or forgery in violation of D.C. law. We agree that the evidence established that Ms. Wilde committed all three criminal acts. Because the Board found disbarment appropriate based on the theft and conduct after the theft, however, we need not depart from its recommendation.

## I.  Factual Background

Ms. Wilde joined the District of Columbia Bar in 1993 while remaining a member of the Maryland Bar. She practiced immigration law with Christopher Teras at Teras & Wilde, PLLC, from October 2004 to January 2009.

In May 2007, Ms. Wilde traveled to Incheon, South Korea, for Teras & Wilde

business. Erica Yoon was a passenger on Ms. Wilde's flight. Ms. Yoon testified before the Hearing Committee that during the flight, a flight attendant woke her and alerted her that the attendant had witnessed Ms. Wilde going through Ms. Yoon's purse while Ms. Yoon was sleeping. Ms. Yoon testified that she boarded the flight with at least $1,500 in cash but only four $100 bills remained in her wallet at that point. The four bills in Ms. Yoon's wallet all had a serial number beginning "FL171737." Ms. Yoon testified that after she and the flight attendant confronted Ms. Wilde, the in-flight purser, Sang Hoon Kim, examined the money in Ms. Wilde's envelope and stated that the serial numbers for some of the bills in the envelope were sequential to those in Ms. Yoon's wallet.

Upon arrival in Incheon, police officers took Ms. Wilde and Ms. Yoon to the police station in the airport terminal. Police informed Ms. Wilde of the in-flight purser's finding, and Ms. Wilde provided a sworn statement. The police also photocopied the bills and listed each serial number on a seizure report.

## II. Procedural History

### A. Theft Conviction

Ms. Wilde was charged with theft in the Incheon District Court and when she failed to appear, the court entered a default decision against her. Two months later,

Ms. Wilde filed a motion for a formal trial after learning of the default decision. The court granted her motion, held a trial, and, after considering documentary evidence presented by Ms. Wilde, found her guilty of theft. Ms. Wilde appealed her conviction to the Incheon District Court of Criminal Appeals, arguing that the trial court made a mistake of fact. Ms. Wilde and the prosecuting attorney were permitted to call witnesses and present documentary evidence during the appeal.

While Ms. Wilde's appeal was pending in the Incheon appellate court, Maryland's Attorney Grievance Commission (AGC) initiated proceedings against Ms. Wilde based on the theft and alleged that she had forged bank documents that she presented to the Incheon District Court. The Montgomery County Circuit Court in Maryland ultimately concluded that Ms. Wilde had not committed theft or forgery. Based on the Maryland court's decision, Ms. Wilde argued that the Incheon appellate court should reverse her conviction. The Incheon appellate court declined to defer to the Maryland court's decision and dismissed Ms. Wilde's appeal after finding that her arguments were without merit.

**B.       Documents Presented to Incheon District Court**

Ms. Wilde proffered a number of documents to the Incheon District Court during her criminal prosecution. These included an undated Commerce Bank

document listing serial numbers of bills withdrawn by Ms. Wilde; a February 15, 2008, letter with the same list; a May 5, 2008, letter from a bank employee describing how he compiled the list of serial numbers; an August 25, 2008, letter informing Ms. Wilde that the bank could not provide records to the Incheon District Court; a December 19, 2008, letter including bank records; a collection of letters from Senior Counsel at Commerce Bank regarding Ms. Wilde's case; and a check sent to Ms. Yoon. For ease of reference, as these documents formed the basis of the rule violations charged against Ms. Wilde before us here, our description of the documents' role in the Incheon criminal case will also note significant related evidence that was subsequently presented to the Hearing Committee in the present disciplinary matter.

### 1. Undated Document and List of Serial Numbers

Ms. Wilde submitted an undated document that stated, "Please note that Jinhee Wilde of Teras & Wilde, PLLC, withdrew $1000 worth of 100 bills from Dupont Circle Branch" and listed the serial numbers that Ms. Wilde allegedly withdrew. The document was not on bank letterhead and was purportedly signed by Brian Vinson, a customer service representative at Commerce Bank's Dupont Circle location.

During Ms. Wilde's D.C. disciplinary proceedings, Mr. Vinson testified that

he provided a "verification" of the serial numbers for currency Ms. Wilde withdrew, but also testified that he didn't "actually" remember providing Ms. Wilde with a list of serial numbers, that he did not recognize the documents, and that he could only have prepared such a verification if the money was actually in front of him.[2] And testimony from bank employees indicated that the bank labeled its separate locations as "stores," not "branches." For her part, Ms. Wilde testified that she created the list because of her "woman's intuition" and that she had made similar currency lists "[a] couple of [other] times."

## 2. February 15, 2008, Letter

Ms. Wilde also submitted to the criminal court a letter dated February 15, 2008, with the same list of serial numbers as the undated document, bearing Mr. Vinson's signature and raised notary seal and the signature of Roxy Angha, another bank employee and a D.C. notary. Both the undated list and the February 15 letter's list contained the serial number FL17173756C, which corresponded with one of the four bills that remained in Ms. Yoon's wallet and failed to include the serial number of one of the bills seized from Ms. Wilde, namely FL17173765C. Ms. Angha later testified to the Hearing Committee that she did not sign the February 15, 2008, letter

---

[2] Due to these discrepancies, the Hearing Committee described Mr. Vinson's testimony as "in some respects confusing."

and that it was a "forged and fraudulent document."

### 3. May 5, 2008, Letter

The May 5, 2008, letter Ms. Wilde submitted purported to respond to a letter she had previously sent to Mr. Vinson on April 30, 2008, requesting that Mr. Vinson verify how he created the list of serial numbers and requesting information about whether Ms. Yoon was a client of the bank. The signatures of Mr. Vinson and Carlos Gomez, a Teras & Wilde employee and a notary, appeared on the letter.

Mr. Gomez testified to the Hearing Committee that he did not notarize the letter, did not recognize the letter, and was unfamiliar with Mr. Vinson. Mr. Vinson additionally testified that he never received the April 30 letter, that he did not sign the May 5 response letter, and that he would not have made the representations in the May 5 letter, including the letter's statement that Ms. Yoon was not a client of the bank.

### 4. August 25, 2008, Letter

Ms. Wilde also submitted a letter dated August 25, 2008, from the bank that purported to respond to a letter she sent to Mr. Vinson in June 2008 relaying that the Incheon District Court wanted to see the "actual[] . . . bank books" to verify the serial numbers listed in the February 15 letter. The August 25 letter stated that the bank

was "not able to comply" with the request due to "federal regulations" and "the [Incheon District Court] judge's continued questioning of the veracity of the notarized, sworn statements we provided, in two separate occasions, clearly shows his bias for the prosecution," and the bank was "deeply offended by this judge's implication that our bank employees would lie about our transactional records." The letter bore the signature of "David Chaulker," noted his title as "Vice President and General Manager," and copied "Chief Legal Counsel" Stephanie Tejum.

Testifying to the Hearing Committee, a bank employee named David Chalker confirmed the misspelling of his last name in the letter, denied writing the letter, clarified that the title of his position was "Bank Vice President and Store Manager," and stated that he did not know anybody by the name of Stephanie Tejum.

## 5.  December 19, 2008, Letter

The second Chalker letter Ms. Wilde submitted to the Incheon court, dated December 19, 2008, included attachments purporting to be bank records. This letter used the same signature block as the August 25 letter, including the misspelling of Mr. Chalker's name and the incorrect reference to his title and to the Dupont Circle store as a "Branch." The letter stated that Mr. Chalker would leave his position in December 2008. Mr. Chalker later told the Hearing Committee that he had nothing to do with the letter or the attached records and that he did not leave the Dupont

Circle location until May 2012.

### 6. Letters from Senior Counsel at Commerce Bank

Ms. Wilde submitted five letters purportedly from Christopher Tucci, Senior Counsel at the bank. Mr. Tucci testified in a video deposition that he had nothing to do with the letters. Outside counsel to the bank, Robert Dietrick, also testified at the hearing committee that there were no letters from Mr. Tucci and that the letters Ms. Wilde presented as Mr. Tucci's contained several representations that the bank would not make.

### 7. Checks

After learning about Ms. Wilde's criminal proceedings in South Korea, Christopher Teras—her law partner—informed her that he wanted to dissolve their law firm. Around six months later, Ms. Yoon's son and two other individuals received suspicious checks from Mr. Teras's employment recruiting company, Worldwide Personnel, Inc. Ms. Yoon's son received a $10,000 check addressed to Ms. Yoon from Worldwide and signed by Mr. Teras. The check's memo line stated that it was for the "JHW case." Ms. Wilde submitted this check as evidence in her criminal appeal in the Incheon District Court and argued that Ms. Yoon and Mr. Teras had conspired against her. Mr. Teras testified to the Hearing Committee that he did not send the check or authorize anyone to sign the check.

Around the same time, Nancy Garland Miller, the outside bookkeeper for Worldwide and Founder and President of the Combat Soldiers Recovery Fund charity, also received a check made out to the charity from Mr. Teras. Ms. Garland Miller testified that in July 2009, she received a check from Mr. Teras "out of the blue" that she was "shocked" to have received because she was "in conversation with [Mr. Teras] all the time" and knew that Mr. Teras was "having financial problems." She testified that she called Mr. Teras, who told her that he knew nothing about the check. Mr. Teras also testified that he did not authorize the check.

Theodore Kim, a consultant for Worldwide, received the third check. Mr. Kim testified that he had an agreement with Mr. Teras to be paid $1,000 per month for his advice, but that he received a check for $5,000 in July 2009 and contacted Mr. Teras to thank him for the payment. Mr. Teras testified that he did not understand why Mr. Kim was thanking him for the check until a month later, when he realized that the check was for $5,000, at which point Mr. Teras asked Mr. Kim to pay him back. Mr. Teras further testified that although the check was addressed to "Theodore U.C. Kim," Mr. Teras did not normally include Mr. Kim's middle initials, and Disciplinary Counsel entered as exhibits examples of other checks signed by Mr. Teras that did not include Mr. Kim's middle initials.

Teras & Wilde employed an in-house bookkeeper, Emily Staats, who also

worked for Worldwide. Ms. Staats testified to the Hearing Committee that there was one set of keys to the file cabinet where the Worldwide checks were kept and that if Mr. Teras and Ms. Staats were both out, she would "[p]robably" leave the keys with Ms. Wilde. Mr. Teras and Ms. Staats testified that Mr. Teras would sign the Worldwide checks in blank so that Ms. Staats could make payments in his absence.

## C.     Disciplinary Proceedings in the District of Columbia

Disciplinary Counsel filed a petition with this court requesting that Ms. Wilde be suspended from the practice of law pursuant to D.C. Bar R. XI, § 10 based on her conviction for theft in South Korea. This court ultimately ruled that a foreign conviction will not justify automatic discipline under § 10, but concluded that a foreign conviction might have collateral estoppel effect in an original discipline proceeding under D.C. Bar R. XI, § 8. *In re Wilde (In re Wilde I)*, 68 A.3d 749, 766 (D.C. 2013).

After this court decided *In re Wilde I*, Disciplinary Counsel initiated an original proceeding against Ms. Wilde under D.C. Bar R. XI, § 8 and charged her with violating the following Rules of Professional Conduct: Rule 3.3(a)(1) (knowingly making false statements of fact to a tribunal); Rule 3.3(a)(4) (knowingly offering evidence she knew to be false); Rule 3.4(b) (falsifying evidence); Rule

8.1(a) and (b) (making false statements of fact in connection with a disciplinary matter); Rule 8.4(b) (committing theft in violation of D.C. and South Korean law, committing fraud in violation of D.C. law, and committing forgery in violation of D.C. law); Rule 8.4(c) (engaging in conduct involving fraud, deceit, misrepresentation, or dishonesty); and Rule 8.4(d) (engaging in conduct interfering with the administration of justice).

Ms. Wilde filed a motion to preclude the misconduct charges based on collateral estoppel due to the outcome of the Maryland proceedings. The Maryland court had found that Ms. Yoon's testimony regarding the theft was incredible because she could not "keep her story straight,"[3] that the South Korean police "neither photocopied the bills seized from Wilde nor created a complete list of the bills' serial numbers," and that Ms. Wilde did not forge the undated list of serial numbers or the bank letters. The Maryland court described Mr. Vinson's testimony as "cagy" and found Mr. Chalker's testimony to be "neither accurate nor truthful." Regarding Mr. Chalker in particular, the Maryland court concluded that he "testified falsely to [the] court about his role because he knew that his conduct violated bank

---

[3] Ms. Yoon testified to the Hearing Committee that she testified in Maryland over telephone and was not provided a translator during the call.

policy."[4]   The D.C. Hearing Committee denied the motion on the ground that the District of Columbia was not a party to the Maryland proceedings.[5]

The Hearing Committee heard testimony from 20 witnesses over seven days. Ms. Yoon gave in-person testimony to the Hearing Committee with a translator. Disciplinary Counsel and Ms. Wilde together submitted well over 100 exhibits, including information not presented to the Maryland court, like the Tucci letters, the Worldwide checks, and photocopies that South Korean police took of both Ms. Wilde's seized bills and Ms. Yoon's seized bills, along with the police's seizure report listing the serial numbers of the bills seized from Ms. Wilde.

The Hearing Committee concluded that Ms. Wilde committed most of the rule violations with which she was charged.[6]   The Hearing Committee determined that Ms. Wilde committed the theft, finding Ms. Yoon's testimony credible.   The

---

[4] The Maryland court was not presented with the Tucci letters or the Worldwide checks.

[5] In its final Report and Recommendation, the Hearing Committee stated that while it took the Maryland proceedings into consideration, it received "more evidence" than the Maryland court, including witnesses who did not testify in Maryland.

[6] The Hearing Committee concluded that there was no clear and convincing evidence that Ms. Wilde committed criminal fraud under Rule 8.4(b).

Committee also found that Ms. Wilde had forged the undated list of serial numbers, noting that her credibility was undermined by her failure to provide the undated list to the police and her inability to articulate a reason beyond "woman's intuition" for making the list in the first place. The Hearing Committee also determined that Ms. Wilde forged all of the bank employee letters because each purported signatory and notary credibly testified that they did not authorize or have anything to do with the letters, and the letters contained numerous irregularities, including misspelled names, incorrect titles, and inaccurate references to the Dupont Circle store as the Dupont Circle "branch." Finally, the Committee concluded that Ms. Wilde forged the Worldwide checks, noting that she had access to the checks, that Mr. Teras said he did not authorize any of the checks, and that all of the recipients found the checks perplexing and ultimately returned them to Mr. Teras. The Hearing Committee recommended a sanction of disbarment after determining that the mitigating factors, including Ms. Wilde's lack of prior discipline, did not outweigh her dishonesty and lack of remorse.

Before the Board, Ms. Wilde took exception to the Hearing Committee's findings and recommendation. Disciplinary Counsel took exception to the Committee's conclusion that Ms. Wilde had not committed fraud under D.C. law. The Board found that neither party's objections had merit. The Board agreed with the Hearing Committee's determination that Disciplinary Counsel was not in privity

with the Maryland AGC, noting that no evidence in the record suggested that Disciplinary Counsel participated in the Maryland proceedings and that the Hearing Committee was presented with "more and different evidence" than the Maryland court. The Board adopted the Hearing Committee's findings and conclusions, except as to Rule 8.4(b). While the Board found that there was "overwhelming evidence that [Ms. Wilde] created false and fraudulent documents and used those documents to attempt to defeat the South Korean prosecution," it concluded that Disciplinary Counsel failed to demonstrate that Ms. Wilde's course of conduct occurred "within the District's boundaries," a necessary element of D.C. fraud and forgery laws. The Board thus determined that she violated Rule 8.4(b) only by committing the theft.

### III.  Ms. Wilde's Exceptions to the Board's Report

Ms. Wilde argues that (1) the Maryland court's decision precluded the Hearing Committee's and the Board's conclusions, (2) the Hearing Committee and the Board should have deferred to the Maryland court's factual findings, (3) the Hearing Committee improperly admitted the Incheon District Court transcripts, and (4) the Hearing Committee's and the Board's factual findings are unsupported by substantial evidence.

## A. Collateral Estoppel

Ms. Wilde primarily argues that the Hearing Committee and the Board should have given preclusive effect to the Maryland court's conclusion that she did not commit theft or forgery. Disciplinary Counsel argues that Ms. Wilde waived her collateral estoppel argument because she did not raise it in her post-hearing brief to the Hearing Committee. Even assuming that Ms. Wilde properly preserved this argument, collateral estoppel does not apply here.

This court reviews the Board's legal conclusions, including whether the requirements of collateral estoppel were met, de novo. *In re Robbins*, 192 A.3d 558, 565 (D.C. 2018); *In re Vohra*, 68 A.3d 766, 769 (D.C. 2013). The doctrine of collateral estoppel "renders conclusive an issue of fact or law essential to a determination where there has been a final judgment on the merits that has been actually litigated by the same parties or their privies." *In re Robbins*, 192 A.3d at 565. The key question in this case is whether Disciplinary Counsel and the Maryland AGC were in privity.

"Privies are sometimes described as 'those who control an action although not parties to it; those whose interests are represented by a party to an action; and successors in interest.'" *Id*. at 565-66 (quoting *Carr v. Rose*, 701 A.2d 1065, 1075

(D.C. 1997)). When this court in *In Re Robbins* addressed the question whether Disciplinary Counsel was in privity with its corresponding disciplinary entity in Virginia, the Virginia Bar Counsel, we concluded that privity must be analyzed on a case-by-case basis to assess the level of involvement Disciplinary Counsel had in the other jurisdiction's disciplinary proceeding.[7] *Id.* at 566. In *In re Robbins*, the court concluded that Disciplinary Counsel was not in privity with the Virginia Bar Counsel because there was "no evidence that Disciplinary Counsel participated in the Virginia proceedings or coordinated with Virginia's Bar Counsel to present consistent arguments." *Id.* We noted, too, that it was "especially significant" that the Virginia court "reli[ed] on an inferior record"—the Hearing Committee in

---

[7] Ms. Wilde additionally argues that this court should reject the case-by-case approach of *In re Robbins* and conclude that Disciplinary Counsel and the Maryland AGC are necessarily privies because collateral estoppel is "systematically . . . applied in reciprocal discipline cases." While this court has permitted Disciplinary Counsel to wield foreign convictions against a respondent, such use of offensive non-mutual collateral estoppel requires that the respondent against whom estoppel is invoked (that is, the original defendant or a privy) must have had a "full and fair opportunity for litigation." *In re Wilde*, 68 A.3d at 759 (internal quotation marks omitted) (quoting *Modiri v. 1342 Rest. Grp., Inc.,* 904 A.2d 391, 394 (D.C. 2006)). In Ms. Wilde's case, defensive non-mutual collateral estoppel does not permit her to use a prior resolved issue as a shield against Disciplinary Counsel if it was not a party or privy to the original proceedings. *Cf. Walker v. FedEx Off. & Print Servs., Inc.*, 123 A.3d 160, 164 (D.C. 2015) (noting that defensive collateral estoppel may be invoked by any defendant, even one not party to the original proceedings, if the party against whom collateral estoppel is invoked (the original plaintiff or a privy) had "a full and fair opportunity to litigate" the issue in the prior proceeding (internal quotation marks omitted) (quoting *Montana v. United States*, 440 U.S. 147, 153-54 (1979))).

District of Columbia heard from live witnesses, whereas the Virginia court based its decision on a cold record. *See id.* We also acknowledged that the Virginia court "offered no analysis" to support its findings. *Id.*

In Ms. Wilde's case, the Hearing Committee and the Board correctly concluded that Disciplinary Counsel and the Maryland AGC were not privies. The Board concluded that "[t]here is no evidence in the record that Disciplinary Counsel participated in the Maryland proceedings." Giving preclusive effect to the Maryland decision would therefore have been inappropriate. Ms. Wilde asserts, but without record citation, that "Disciplinary Counsel requested permission of the Board to share its file with Attorney Grievance Commission of Maryland and said request was granted by Order dated December 7, 2010." This court cannot locate any such order in the record.[8] We therefore reject Ms. Wilde's contention that the Hearing Committee and the Board should have given preclusive effect to the result of the Maryland case.[9]

---

[8] Sharing this file alone would not necessarily lead to a finding of privity when evidentiary discrepancies between the Maryland court and Hearing Committee proceedings indicate that the Maryland AGC did not adequately represent Disciplinary Counsel's interests. *See In re Robbins*, 192 A.3d at 565-66.

[9] Even if Disciplinary Counsel and the Maryland AGC were in privity, the Hearing Committee resolved several issues that the Maryland court did not,

### B. Deference to the Maryland Court's Decision

Ms. Wilde also argues that, even if collateral estoppel does not give the Maryland decision preclusive effect, the Hearing Committee and the Board should have deferred to the Maryland court's factual findings.

Generally, "[w]e defer to findings of fact made by other courts in reciprocal proceedings." *In re Gallagher*, 886 A.2d 64, 66 (D.C. 2005). Deference to other courts' discipline determinations is warranted because "there is merit in according deference, for its own sake, to the actions of other jurisdictions with respect to the attorneys over whom we share supervisory authority." *In re Zdravkovich*, 831 A.2d 964, 969 (D.C. 2003) (citing *In re Velasquez*, 507 A.2d 145, 147 (D.C. 1986)). Thus, deference may be appropriate even when collateral estoppel is not. *See, e.g.*, *In re Robbins*, 192 A.3d at 566 n.7 (noting that while the Virginia decision was not entitled to preclusive effect, that "d[id] not mean that we will not defer to final decisions in other jurisdictions' disciplinary proceedings").

Ms. Wilde argues that the Hearing Committee and the Board should always

---

including whether Ms. Wilde forged the Worldwide checks and the Tucci letters, thus calling into question whether giving collateral estoppel effect to the Maryland proceeding would relieve Ms. Wilde from discipline.

defer to findings of fact made by sister jurisdictions, regardless of whether that jurisdiction imposed discipline. But she does not cite any authority requiring such deference outside of a reciprocal discipline proceeding, *see* D.C. Bar R. XI § 11, and we are unpersuaded that deference was required under these circumstances, much less in every nonreciprocal discipline cases.

In Ms. Wilde's case, the Hearing Committee and the Board considered the findings made by the Maryland court and specified that they departed from those findings because the Hearing Committee "was presented with more evidence than that which had been submitted in the Maryland proceeding, including the testimony of witnesses who did not testify in Maryland." The Maryland court published a sixteen-page opinion that had few citations and misstated several key facts. Such circumstances highlight why we are not persuaded that deference in all nonreciprocal discipline cases is appropriate.

### C.        Incheon District Court Transcripts

Ms. Wilde also challenges the Hearing Committee's admission of transcripts from the Incheon District Court criminal proceedings, arguing that they were "unreliable and not on par with transcription requirements in the United States" and that they "contain[ed] hearsay within hearsay."

The Hearing Committee may admit any evidence that is "relevant, not privileged, and not merely cumulative." Board Prof. Resp. R. 11.3. It may additionally be "guided by, but shall not be bound by the provisions or rules of court practice, procedure, pleading, or evidence." *Id.* For this reason, this court has concluded that the Hearing Committee may consider hearsay evidence. *See In re Kennedy*, 605 A.2d 600, 603 (D.C. 1992). Although disciplinary proceedings are not bound by evidentiary rules, they are nevertheless "adversary, adjudicatory proceedings" and "due process safeguards must be observed." *In re Thorup*, 432 A.2d 1221, 1225 (D.C. 1981) (citing *In re Ruffalo*, 390 U.S. 544 (1968)). As the Incheon District Court transcripts were undoubtedly relevant, the issue is whether admitting the transcripts violated Ms. Wilde's due process rights.

Ms. Wilde first argues that the Hearing Committee should not have admitted the transcripts because they were not prepared in accordance with U.S. standards. Specifically, she argues that in South Korea witness examinations are transcribed word for word "as much as possible"; that statements by the judge may not be transcribed word-for-word, depending on the content of the judge's statement; that the prosecutor's arguments may be summarized; and that objections in the transcript "may not be the exact words." Ms. Wilde also argues that the transcripts contain double hearsay, which "cannot be considered as meeting any test of reliability."

Ms. Wilde's contentions fail because she has not pointed to any concrete unfairness in the Hearing Committee's admission of the evidence in this case. Though she has drawn the court's attention to some differences between the South Korean and U.S. methods for transcribing criminal proceedings, she does not articulate how any of these differences resulted in a due process violation. Ms. Wilde does not point to any instance where information is missing from the transcripts due to the South Korean transcription procedures, undercutting any inference that the Hearing Committee used the transcripts to resolve issues against Ms. Wilde without knowing all the facts. There is also no indication that the Hearing Committee unduly relied on the Incheon District Court transcripts in drawing its conclusions about Ms. Wilde's misconduct, and in fact it relied primarily upon Ms. Yoon's live testimony and the unobjected-to South Korean police reports, exhibits, and investigation in concluding that Ms. Wilde committed the theft. Ms. Wilde is also concerned that witnesses in the Incheon District Court criminal trial testified to the actions and statements of the in-flight purser who initially wrote down the serial numbers on Ms. Yoon's and Ms. Wilde's bills. But there is no indication that the testifying witnesses inaccurately relayed the actions or statements of the purser or that the Hearing Committee unduly relied on the purser's statements or actions to conclude that Ms. Wilde committed the theft.

For these reasons, we conclude that the Hearing Committee was permitted to

admit the relevant, nonprivileged, and noncumulative Incheon District Court transcripts under Board Rule 11.3 and that their admission did not violate Ms. Wilde's due process rights.

### D.    Factual Findings

Ms. Wilde makes two interrelated challenges to the Hearing Committee's findings of fact.  She argues that the Hearing Committee made flawed credibility determinations and that the Board should not have incorporated and adopted the Hearing Committee's findings that she committed theft, forged documents, and forged checks because they were not supported by substantial evidence.[10]

"In disciplinary cases, the Board must accept the Hearing Committee's evidentiary findings, including credibility findings, if they are supported by substantial evidence in the record." *In re Cleaver-Bascombe* (*Cleaver-Bascombe I*), 892 A.2d 396, 401 (D.C. 2006)).  "This court, in turn, must accept the Board's findings of fact, and we also apply the 'substantial evidence' standard." *Id.* "Substantial evidence means evidence that a reasonable person would consider adequate to support a conclusion." *Furtick v. D.C. Dep't of Emp. Servs.*, 921 A.2d

---

[10] Ms. Wilde does not challenge the Hearing Committee and the Board's conclusions regarding false statements that she made to the Disciplinary Counsel.

787, 790 (D.C. 2007) (internal quotation marks omitted) (quoting *Wash. Post v. D.C. Dep't of Emp. Servs.*, 853 A.2d 704, 706 (D.C. 2004)).

In this case, substantial evidence supports the Hearing Committee's credibility findings that the Board later adopted. Ms. Wilde alleges that the Hearing Committee and the Board failed to resolve various inconsistencies and uncertainties in her favor, as the Maryland court did.[11] But the Hearing Committee and the Board were not required to accept Ms. Wilde's version of the story. Notably, doing so would have required them not only to discredit most of the witnesses—including Ms. Yoon, Mr. Teras, all of the bank employees, and neutral witnesses such as Ms. Staats and Mr. Gomez—but to determine that a number of them were lying under oath.[12] We are required to "place great weight on credibility determinations made by the Board and the Hearing Committee because of the Hearing Committee's unique opportunity to observe the witnesses and assess their demeanor." *In re Klayman*, 282 A.3d 584, 593 (D.C. 2022) (per curiam) (internal quotation marks

---

[11] For example, Ms. Wilde takes issue with the Hearing Committee's failure to "hone[] in" on the bank employees' motive to lie about whether they had authorized bank documents that contained illegal representations not compliant with bank policy.

[12] In fact, the Maryland court was only able to find in Ms. Wilde's favor after it found several key witnesses, including Ms. Yoon, Mr. Vinson, and Mr. Chalker, incredible.

omitted) (quoting *In re Pearson*, 228 A.3d 417, 423 (D.C. 2020)). This court therefore declines Ms. Wilde's invitation to reweigh the credibility determinations made after the witnesses testified before the Hearing Committee. *See In re Pye*, 57 A.3d 960, 973 (D.C. 2012).

Substantial evidence also supports the Hearing Committee's and the Board's findings that Ms. Wilde committed theft, forged documents, and forged the Worldwide checks. As to the theft, the record contains Ms. Yoon's testimony about the theft, witness statements from the South Korean police investigation, and photocopies of the remaining bills in Ms. Yoon's purse with sequential numbering to the bills in Ms. Wilde's possession. All this more than surpasses the substantial evidence standard. Disciplinary Counsel also presented substantial evidence that Ms. Wilde forged bank documents.[13] Testimony from the purported signers and notaries of every letter—Ms. Angha, Mr. Vinson, Mr. Gomez, Mr. Chalker, and Mr. Tucci—indicated that they were in no way involved with the creation of any of the bank letters. Several irregularities in the letters further bolstered the finding: the letters misspelled names and included incorrect titles for Mr. Vinson and Mr. Chalker, referred to the Dupont Circle store as the Dupont Circle "Branch" on

---

[13] Ms. Wilde does not explicitly challenge the Hearing Committee's conclusions that Ms. Wilde forged five letters from Christopher Tucci, Senior Counsel at the bank.

multiple occasions despite several witnesses stating that the bank labeled each individual location as a "store," relayed information that the employees would not have been permitted to share such as Ms. Yoon's membership status at the bank, and listed the serial number of one of the bills which remained in Ms. Yoon's wallet after the theft.

Finally, Ms. Wilde argues that the Hearing Committee lacked substantial evidence to find that she forged the Worldwide checks. Ms. Wilde asserts that there is no evidence that she had access to the locked drawer in which the blank, presigned checks were kept. The in-house bookkeeper, however, testified that Ms. Wilde had access when the bookkeeper and Mr. Teras were on vacation. The Hearing Committee also heard testimony from Mr. Teras that he did not create or authorize of any of the checks, as well as testimony from Mr. Teras and each check recipient that the checks were out of the norm. Under these circumstances, the Hearing Committee and the Board had substantial evidence to find that Ms. Wilde forged the checks.

"This court must accept a finding that is supported by substantial evidence in the record as a whole, even though there may also be substantial evidence in the record to support a contrary finding." *In re Godette*, 919 A.2d 1157, 1163 (D.C. 2007) (internal quotation marks omitted) (quoting *Baumgartner v. Police &*

*Firemen's Ret. & Relief Bd.*, 527 A.2d 313, 316 (D.C. 1987)). Accordingly, we will not disturb the Hearing Committee's and the Board's findings.

## IV.  Disciplinary Counsel's Exceptions to the Board's Report

Disciplinary Counsel argues that the Board erred in determining that Ms. Wilde did not commit fraud or forgery. The Board concluded that Ms. Wilde's actions creating forged bank letters and checks were not sufficiently connected to the District such as to subject her to prosecution here.

When charging a violation of Rule 8.4(b), Disciplinary Counsel "may look to the law of any jurisdiction that could have prosecuted [the] respondent" for the misconduct in question. *In re Slattery*, 767 A.2d 203, 212 (D.C. 2001) (internal quotation marks omitted) (quoting *In re Gil*, 656 A.2d 303, 305 (D.C. 1995)). Disciplinary Counsel charged Ms. Wilde with Rule 8.4(b) violations due to her commission of fraud under D.C. Code § 22-3221 and forgery under D.C. Code § 22-3241. To be liable under these provisions, however, at least one element of the offense must have occurred "within the geographic boundaries of the District of Columbia." *See Dobyns v. United States*, 30 A.3d 155, 157-58 (D.C. 2011) (citing *United States v. Baish*, 460 A.2d 38, 40 (D.C. 1983)). The Board found that while "overwhelming evidence" indicated that Ms. Wilde forged documents in a fraudulent attempt to defeat the South Korean prosecution, no Rule 8.4(b) violation

occurred because there was "no proof" that Ms. Wilde's actions "emanated from a location *in* the District of Columbia" such that Ms. Wilde could have been prosecuted under either § 22-3221 or § 24-3241.

We disagree with the Board. Ms. Wilde could have been prosecuted in the District for her fraudulent conduct and forgeries. Teras & Wilde's D.C. address appears as the recipient address on many of the forged letters. Additionally, Ms. Angha's D.C. notary stamp appears on the February 15 letter, Mr. Gomez's D.C. notary stamp appears on the May 5 letter, and Mr. Gomez testified that he kept his stamp in his desk drawer at the D.C. office. Teras & Wilde kept the Worldwide checks in a locked cabinet in the D.C. office—indicating that Ms. Wilde took them while in the District—and those checks included a D.C. return address on the face of the checks and on the envelopes in which Ms. Wilde mailed the checks. For these reasons, we conclude that Ms. Wilde's actions could have subjected her to prosecution for forgery and fraud in the District of Columbia and thus that she committed the violations of Rule 8.4(b) with which she was charged.

## V. Disbarment

Ms. Wilde argues, finally, that the Board should have recommended a less severe sanction than disbarment—namely, a suspension. She contends that the Board should have taken into account several mitigating factors, including her

"distinguished career," her "complete lack of disciplinary infractions," and the fact that the conduct at issue was unrelated to any of her clients or the practice of law.

This court adopts the Board's recommended sanction "unless to do so would foster a tendency toward inconsistent dispositions for comparable conduct or would otherwise be unwarranted." D.C. Bar R. XI, § 9(h)(1). "[A]lthough we must give considerable deference to the Board's recommendations in these matters, the responsibility for imposing sanctions rests with this court in the first instance." *Godette*, 919 A.2d at 1164 (internal quotation marks omitted) (citing *In re Temple*, 629 A.2d 1203, 1207 (D.C. 1993)). When determining the appropriate disciplinary sanction, this court takes the following factors into consideration:

> (1) the seriousness of the conduct at issue; (2) the prejudice, if any, to the client which resulted from the conduct; (3) whether the conduct involved dishonesty and/or misrepresentation; (4) the presence or absence of violations of other provisions of the disciplinary rules[;] (5) whether the attorney had a previous disciplinary history; (6) whether or not the attorney acknowledged his or her wrongful conduct; and (7) circumstances in mitigation of the misconduct.

*In re Pelkey*, 962 A.2d 268, 281 (D.C. 2008) (quoting *In re Thyden*, 877 A.2d 129, 144 (D.C. 2005)). In cases involving dishonesty, this court has imposed disbarment for dishonesty "of the flagrant kind." *Id.*

In this case, we conclude that disbarment is warranted based on Ms. Wilde's theft and repeated and pervasive dishonesty. This court has imposed disbarment in several comparable cases involving a combination of criminal or fraudulent conduct and subsequent dishonesty in order to cover up that conduct, even in cases where attorneys had no previous discipline and the misconduct did not directly harm a client. *See, e.g.*, *In re Baber*, 106 A.3d 1072, 1077-78 (D.C. 2015) (disbarring lawyer with no previous discipline for making "prolonged and repeated" false statements to client and Disciplinary Counsel over two-year period and showing no remorse); *In re Cleaver-Bascombe*, 986 A.2d 1191, 1200 (D.C. 2010) (imposing disbarment and stating that "lying under oath on the part of an attorney for the purpose of attempting to cover-up previous . . . [misconduct] . . . is absolutely intolerable" (alterations in original) (internal quotation marks omitted) (quoting *In re Cleaver-Bascombe* (*Cleaver-Bascombe I*), 892 A.2d 396, 412 (D.C. 2006))); *Pelkey*, 962 A.2d at 281 (disbarring attorney with no prior discipline for lack of remorse after engaging in fraud). Because doing so would not result in an inconsistent disposition to impose disbarment in Ms. Wilde's case, we adopt the Board's recommended sanction.

## VI.  Conclusion

Ms. Wilde is disbarred from the practice of law in the District of Columbia.

For purposes of reinstatement, the disbarment period runs from the date on which Ms. Wilde filed her D.C. Bar Rule XI, § 14(g) affidavit.

*So ordered.*